UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
―――――――――――――――――――――――――

COLONIAL FUNDING NETWORK, INC. as
servicing provider for TVT CAPITAL, LLC

                Plaintiff,

    - against -

EPAZZ, INC., CYNERGY CORPORATION and
SHAUN PASSLEY *a/k/a* SHAUN A. PASSLEY

                Defendants.

―――――――――――――――――――――――――

EPAZZ, INC. and SHAUN PASSLEY,

              Counterclaim Plaintiffs,

    - against -

TVT CAPITAL LLC, VANTIFF, LLC
COLONIAL FUNDING NETWORK, INC.
ANDREW FELLUS, WARREN FELLUS,
JOHN DOES 1-10, AND JANE DOES 1-10

              Counterclaim Defendants.

―――――――――――――――――――――――――

Docket No. 16-CV-5948 (LLS)

Hon. Louis L. Stanton


**COLONIAL FUNDING NETWORK, INC.'S
AND TVT CAPITAL LLC'S MEMORANDUM OF LAW
<u>IN SUPPORT OFMOTION TO DISMISS DEFENDANTS' COUNTERCLAIMS</u>**


PROSKAUER ROSE LLP
David A. Picon
Matthew J. Morris
Jonathan E. Siegelaub
11 Times Square
New York, NY 10036
212-969-3000

## TABLE OF CONTENTS

Page(s)

**PRELIMINARY STATEMENT** ................................................................................1

**SUMMARY OF ALLEGATIONS AND STATEMENT OF FACTS**........................3

**ARGUMENT**.........................................................................................................6

      I.       THE USURY COUNTERCLAIMS SHOULD BE DISMISSED..............6

        A.     Defendants Cannot Assert Usury to Seek Affirmative Relief ...................6

        B.     The Agreement Is Not a Loan and Therefore Cannot Be Usurious...........8

              1.     An Agreement Is Only a Loan If the Obligee Has an Absolute Right to Repayment ......................................................................8

              2.     The Agreement Does Not Provide Colonial an Absolute Right to Repayment .................................................................................11

              3.     Defendants' Arguments Are Unavailing ......................................12

        C.     Defendants' Other "Usury"-Based Counterclaims Should Be Dismissed.17

      II.      THE RICO COUNTERCLAIMS SHOULD BE DISMISSED.................18

        A.     The RICO Counterclaims Fail Because There Is No Collection of an Unlawful Debt....................................................................................18

        B.     The RICO Counterclaims Fail for Numerous Additional Reasons ..........18

              1.     Substantive RICO Violation .........................................................18

               2.     Causation and Injury....................................................................22

      III.    The FRAUDULENT INDUCEMENT COUNTERCLAIM SHOULD BE DISMISSED ...........................................................................................23

      IV.    THE PRIMA FACIE TORT COUNTERCLAIM SHOULD BE DISMISSED ...........................................................................................24

      V.     MOST OF THE AFFIRMATIVE DEFENSES SHOULD BE DISMISSED ...........................................................................................24

**CONCLUSION** ....................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*AFG Indus., Inc. v. Empire Glass Co., Inc.*,
226 A.D.2d 487 (2d Dep't 1996) ............................................................................................24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ...................................................................................................................6

*Bango v. Naughton*,
184 A.D.2d 961 (3d Dep't 1992) ...........................................................................................23

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ...................................................................................................................6

*Burns Jackson Miller Summit & Spitzer v. Lindner*,
59 N.Y.2d 314 (1983) .............................................................................................................24

*Chambers v. Time Warner, Inc.*,
282 F.3d 147 (2d Cir. 2002) .....................................................................................................6

*Commercial Cleaning Servs. L.L.C. v. Colin Serv. Sys., Inc.*,
271 F.3d 374 (2d Cir. 2001) ...................................................................................................18

*Condren v. Grace*,
1990 WL 151108 (S.D.N.Y. Oct. 4, 1990) ...........................................................................8, 9

*Costoso v. Bank of Am., N.A.*,
74 F. Supp. 3d 558, 573 (E.D.N.Y. 2015) .............................................................................18

*Cruz v. FXDirectDealer LLC*,
720 F.3d 115 (2d Cir. 2013) .............................................................................................19, 20

*Danann Realty Corp. v. Harris*,
5 N.Y.2d 317 (1959) ...........................................................................................................13, 23

*Donatelli v. Siskind*,
170 A.D.2d 433 (2d Dep't 1991) .............................................................................................8

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
755 F.2d 239 (2d Cir. 1985) ...................................................................................................20

*Eurycleia Partners, LP v. Seward & Kissel, LLP*,
12 N.Y.3d 553 (2009) .............................................................................................................23

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*,
   385 F.3d 159 (2d Cir. 2004)....................................................................................19

*Freihofer v. Hearst Corp.*,
   65 N.Y.2d 135 (1985) ............................................................................................24

*Fried v. Bolanos*,
   217 A.D.2d 823 (3d Dep't 1995) ............................................................................12

*Fuji Photo Film U.S.A., Inc. v. McNulty*,
   640 F. Supp. 2d 300 (S.D.N.Y. 2009)....................................................................22

*Glenfed Fin. Corp., Commercial Fin. Div. v. Aeronautics & Astronautics Servs., Inc.*,
   181 A.D.2d 575 (1st Dep't 1992) ...........................................................................24

*Hochman v. LaRea*,
   14 A.D.3d 653 (2d Dep't 2005) ................................................................................8

*K9 Bytes, Inc. v. Arch Capital Funding, LLC*,
   Index No. 54755/2016 (Sup. Ct. Westchester Cty.) ................................................3

*Merch. Capital Access, LLC v. S. Shore Motorsports, LLC*,
   2011 WL 3875565 (Sup. Ct. Nassau Cty. Aug. 19, 2011) ....................................10

*Merch. Cash and Capital, LLC v. Yehowa Med. Servs., Inc.*,
   Index No. 602039/2016 (Sup. Ct. Nassau Cty. Aug. 2, 2016)...............................11

*MoneyForLawsuits V L.P. v. Rowe*,
   2012 WL 1068171 (E.D. Mich. Jan. 23, 2012)..................................................9, 12

*Ouaknine v. MacFarlane*,
   897 F.2d 75 (2d Cir. 1990)....................................................................................22

*Ozbakir v. Scotti*,
   764 F. Supp. 2d 556 (W.D.N.Y. 2011) ..................................................................19

*Platinum Rapid Funding Grp. Ltd. v. VIP Limousine Servs., Inc.*,
   Index No. 604163/2015 (Sup. Ct. Nassau Cty. June 10, 2016) .......................10, 15

*Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*,
   No. 13-CV-6562 (S.D.N.Y. Aug. 3, 2015)..............................................................11

*Prof'l Merch. Advance Capital, LLC v. Your Trading Room, LLC*,
   2012 WL 12284924 (Sup. Ct. Suffolk Cty. Nov. 28, 2012) .....................................9

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..................................................................................23

*Rudman v. Cowles Commc'ns, Inc.*,
    30 N.Y.2d 1 (1972) .................................................................................................17

*Scantek Med., Inc. v. Sabella*,
    582 F. Supp. 2d 472 (S.D.N.Y. 2008).......................................................................7

*Schneider v. Phelps*,
    41 N.Y.2d 238 (1977) ...............................................................................................7

*Seidel v. E. 17th St. Owners, Inc.*,
    79 N.Y.2d 735 (1992) ...............................................................................................8

*Spool v. World Child Int'l Adoption Agency*,
    520 F.3d 178 (2d Cir. 2008).....................................................................................21

*Staehr v. Hartford Fin. Servs. Grp., Inc.*,
    547 F.3d 406 (2d Cir. 2008)......................................................................................3

*Strategic Funding Source, Inc. v. AR Dental Supply Corp.*,
    Index No. 29923/2008 (Sup. Ct. Kings Cty. Oct. 9, 2009)....................................9, 10, 14, 15

*Transmedia Rest. Co. v. 33 E. 61st St. Rest. Corp.*,
    184 Misc.2d 706 (Sup. Ct. N.Y. Cty. Feb. 7, 2000) ...............................................8, 9

*UFCW Local 1776 v. Eli Lilly & Co.*,
    620 F.3d 121 (2d Cir. 2010).....................................................................................22

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000).....................................................................................21

*Weisel v. Pischel*,
    197 F.R.D. 231 (E.D.N.Y. 2000) .............................................................................21

*Wild Edibles Inc. v. Indus. Workers of World Local 460/640*,
    2008 WL 4548392 (S.D.N.Y. Oct. 9, 2008)...................................................18, 21, 22

*Wood v. General Motors Corp.*,
    2010 WL 3613812 (E.D.N.Y. Aug. 23, 2010).................................................19, 22

*Zola v. Gordon*,
    685 F. Supp. 354 (S.D.N.Y. 1988) ..........................................................................17

*Zoo Holdings, LLC v. Clinton*,
    11 Misc.3d 1051(A), (Sup. Ct. N.Y. Cty. Jan. 24, 2006) .......................................7, 9

## STATUTES

18 U.S.C. §§ 1341 and 1343 ..........................................................................................21

18 U.S.C. § 1962...............................................................................................18, 19, 20, 22

Penal Law §§ 190.40 and 190.42..................................................................................6, 8

**OTHER AUTHORITIES**

Fed. R. Civ. P. 9(b).......................................................................................................23

Fed. R. Civ. P. 12(b)(6)...............................................................................................1, 6

Counterclaim Defendants Colonial Funding Network, Inc. ("Colonial") and TVT Capital LLC ("TVT") respectfully submit this memorandum of law in support of their motion, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss, with prejudice, the Counterclaims and certain of the Affirmative Defenses of Plaintiffs Epazz, Inc. ("Epazz"), Cynergy Corporation ("Cynergy" and with Epazz, collectively, "Epazz") and Shaun Passley ("Passley") (Epazz and Passley, collectively, "Defendants") interposed in Defendants' Answer with Counterclaims.

## PRELIMINARY STATEMENT

It is undisputed that TVT advanced $600,000 to Epazz for the purchase of a specified amount of Epazz's future receivables. Having taken the money and then promptly breached their agreements, Epazz and its principal and guarantor of its performance, Passley, now spend 30 pages and 172 paragraphs trying to not only somehow justify their breaches and keep the money they were advanced, but go on the offensive and seek affirmative relief from TVT, Colonial and the other Counterclaim Defendants. Defendants' Counterclaims, virtually all of which are based on an assertion that the agreements are actually usurious loans and not the purchase and sale of receivables, are facially deficient. Defendants attempt to rewrite the agreements and advance legal theories that courts repeatedly have rejected. Defendants' "allegations," which read more like a brief than claims for relief, are also grounded on speculation and hypotheses, as well as arguments that would fail a Logic 101 class.

As discussed in Point I, Defendants' First Counterclaim, for usury, fails for the simple reason that, under applicable New York law, corporations and guarantors cannot seek affirmative relief based on allegations of usury, civil or criminal. It fails for a second reason – applicable law precludes such a defense based on the terms of the relevant agreements. That is because New York law provides that an agreement can be held usurious only if it is a loan, and an

agreement is a loan only if it provides the obligee with an absolute right of repayment. Numerous courts have held that contracts like the agreements here, under which a merchant sells its future accounts receivable to a funder in exchange for cash, then performs its obligations by remitting a percentage of its receivables to the funder regularly until it pays a specified amount, are not loans. Unlike loans, such agreements do not endow the funder with an absolute right to be repaid, but rather *condition* repayment on a contingency – specifically, payment if and when the merchant has receivables and collections. There is no certainty under the agreements here whether, much less when, such receivables will be collected. As the courts have repeatedly found, that risk or contingency puts repayment at hazard and precludes the Agreements from being deemed loans and thus subject to a usury defense. Try as they might to rewrite their agreements or distort their terms, Defendants cannot get around this authority. Alternatively, even if the agreements could be deemed to be loans – which they are not – under applicable law, the usury claim would fail because the repayment dates were necessarily uncertain due to the condition imposed and, as such, there was no deadline by which repayment was due. Three other Counterclaims (the Second, Seventh and Ninth Counterclaims) likewise fail because they are just the same erroneous "usury" theory, hitched to different legal jargon.

Once the usury allegations are dismissed, the rest of the Counterclaims come tumbling after them. The four civil RICO Counterclaims must also be dismissed because, as discussed in Point II, they all are based on the allegation that Colonial and TVT committed predicate RICO offenses by collecting an unlawful debt, which is another fallacious "usury" argument. Additionally, Defendants have failed to adequately plead the elements of any RICO claim for reasons apart from the faultiness of their usury contentions.

As shown in Point III, Defendants' fraud Counterclaim fails too, because it is based on the contention that salespersons for TVT told Passley that he would receive a loan. Even assuming such statements were made, New York law is clear that people are presumed to read the written contracts they sign. The Agreements, which have standard merger clauses, plainly are not loans (indeed, Defendants expressly so stipulated), so Passley and Epazz could not have relied on any supposed oral representation to the contrary.

As shown in Point IV, the Counterclaim for prima facie tort should be dismissed because Defendants did not and could not factually plead its elements. Further, as shown in Point V, most of Defendants' affirmative defenses should be dismissed because they are based on the same faulty usury and fraud premises as the Counterclaims or are otherwise legally insufficient.

<u>SUMMARY OF ALLEGATIONS AND STATEMENT OF FACTS</u>

The Counterclaims allege that in three transactions between December 2, 2015 and January 28, 2016, TVT disbursed a total of $600,000 to Epazz pursuant to three merchant agreements (whose terms are identical, except as to the economic provisions and hereinafter are referred to as the "Agreement"), which, with their allied Security Agreements, are appended to the Counterclaims[1]. (Counterclaims ¶¶ 17-19 and Exhibits A-C (collectively, the "Agreement").)[2] They also allege that, prior to the disbursements, TVT representatives told Defendants the transactions would be "loans." (Counterclaims ¶¶ 119-29.) Aside from these

---

[1] The Answer and Counterclaims in this action are attached as Exhibit 1 to the Declaration of Jonathan E. Siegelaub, submitted herewith.

[2] Notably, Defendants entered into nearly identical transactions with other cash advance providers and have sought to wriggle out of those agreements as well based on the same assertions of usury and fraud. *See K9 Bytes, Inc. v. Arch Capital Funding, LLC*, Index No. 54755/2016 (Sup. Ct. Westchester Cty.) (action by Epazz and Passley alleging usury) (Siegelaub Ex. 2); *Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (courts may take judicial notice of pleadings in other actions, not for the truth of their averments, but to establish the fact of such litigation).

paragraphs and allegations as to the identities and citizenship of the parties, each and every

allegation in the Counterclaims is either a quotation from the Agreement, a legal argument about

how it should be construed, or a legal conclusion.

In its initial paragraph, entitled "Purchase and Sale of Future Receivables," the

Agreement provides:

> Merchant hereby sells, assigns and transfers to Funder … in consideration of the
> funds provided ("Purchase Price") specified below, all of Merchant's future
> receipts, accounts, contract rights and other obligations arising from or relating to
> the payment of monies from Merchant's customers and/or other third party payors
> (collectively the "Receipts" defined as all payments made by cash, check,
> electronic transfer or other form of monetary payment in the ordinary course of
> the merchant's business) until such time as the "Receipts Purchased Amount" has
> been delivered by Merchant to FUNDER.  The Receipts Purchased Amount shall
> be paid to FUNDER by the Merchant irrevocably authorizing only one depositing
> account acceptable to FUNDER (the "Account") to remit the percentage specified
> below (the "Specified Percentage") of the Merchant's Receipts until such time as
> FUNDER receives payment in full of the Receipts Purchased Amount.

(Counterclaims Ex. A, Doc. 8-1, at page 1 of 6 (emphasis in original).)  The Purchase Price of

the first transaction was $100,000.00, the Specified Percentage was 15%, and the Receipts

Purchased Amount was $149,000.00.  (*Id.*)  Thus, in exchange for an advance of $100,000,

Epazz agreed to remit to TVT 15% of its collections from its customers until TVT received

$149,000.  The other transactions had the same contractual language and Specified Percentage,

but different dates, Purchase Prices, and Receipts Purchased Amounts.  (*Id.* Exs. B, C.)

The initial paragraph of the Agreement continues:

> In consideration of servicing the account, the Merchant hereby authorizes
> FUNDER to ACH Debit the "Specified Daily Amount" from the merchant's bank
> account as the base payment credited against the Specified Percentage due.  It is
> the Merchant's responsibility to provide bank statements for any and all bank
> accounts held by the Merchant to reconcile the daily payments made against the
> Specified Percentage permitting FUNDER to debit or credit the difference to the
> merchant so that payment equals the Specified Percentage.

4

(Counterclaims Ex. A, Doc. 8-1, at page 1 of 6.) For the first transaction, the Specific Daily

Amount was $2,439.00. Thus, the parties further agreed that TVT would be entitled to debit

$2,439 daily, but Epazz had the right and responsibility to provide statements of its actual

collections in order to reconcile the daily payments with the amounts due based on the 15%

Specified Percentage.

> Section 1.9 of the Agreement provides:
>
> Merchant and FUNDER agree that the Purchase Price under this Agreement is in
> exchange for the Purchased Amount and that such Purchase Price is not intended
> to be nor shall it be construed as a loan from FUNDER to Merchant. Merchant
> agrees that the Purchase Price is in exchange for the sale of future Receipts
> pursuant to this Agreement [and] equals the fair market value of such Receipts.

(Counterclaims Ex. A, Doc. 8-1, at page 3 of 6.) Thus, Epazz explicitly agreed that the

Agreement was a sale and not a loan.

Accordingly, § 1.9 further provides that "[p]ayments made to FUNDER in respect of the

full amount of the Receipts shall be *conditioned* upon Merchant's sale of products and services

and the payment therefore by Merchant's customers in the manner provided in Section 1.1."

(*Id.;* emphasis added). In other words, if Epazz did not get paid, TVT would not get paid.

The Agreement provides, in § 1.11, for TVT to have eight enumerated "Protections

Against Default," including, among other things, the right upon default to collect the full

Purchase Amount and all fees due; the right to enforce Passley's Personal Guarantee of

Performance, and the right to file an executed confession of judgment by Epazz. (*Id.* § 1.11.)

"Events of Default" are defined in § 3.1 and include Epazz's violation of the representations and

warranties it gave under the Agreement, its going into bankruptcy, and its going out of business,

but do not include its simply having collections below the amount necessary to support payment

of the Specific Daily Amount. (*Id.* § 3.1.) Thus, the Agreement provides for TVT to have

5

multiple remedies upon default, but it does not provide that reductions in Epazz's payments due to fluctuations in its collections are a default triggering those remedies.

The Agreement provides that New York law applies. (*Id.* § 4.5.) It has a merger clause. (*Id.* § 4.8.) It is accompanied by a Security Agreement granting TVT a security interest in Epazz's accounts receivable and various other assets (*id.* at page 4 of 6), and a personal guarantee of performance (not of payment) by Passley (*id.* at pages 4-5 of 6). It also provides that Colonial is the authorized servicing agent for TVT. (*Id.* at page 5 of 6.)

## ARGUMENT

To survive a Rule 12(b)(6) motion, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The claimant must allege facts that make its claims not only conceivable, but plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 680-81 (2009). Although factual allegations in the complaint are accepted as true for purposes of deciding a motion to dismiss, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* at 678. In deciding a motion to dismiss, the court may rely not only on the pleading, but also on documents that the plaintiff or counterclaimant itself appended to or referenced in its pleading. *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002).

## I.   THE USURY COUNTERCLAIMS SHOULD BE DISMISSED

### A.   Defendants Cannot Assert Usury to Seek Affirmative Relief

Defendants' First Counterclaim is based on Penal Law §§ 190.40 and 190.42, which concern criminal usury. The law is clear, however, that a corporation cannot assert an affirmative claim based on this statute. As explained by Judge McMahon:

> New York's criminal usury statute prohibits a person from knowingly charging interest on a loan at a rate exceeding 25% per annum. N.Y. Penal Law § 190.40.

The statute does not provide for civil liability and from 1860 until 1965, corporations were prohibited by law from asserting criminal usury as a defense to claims brought in a civil action. *Hammelburger v. Foursome Inn Corp.,* 54 N.Y.2d 580, 589, 446 N.Y.S.2d 917, 431 N.E.2d 278 (1981). In 1965, New York amended its statute to allow corporations to "interpose[] a defense of criminal usury" in civil litigation. N.Y. Gen. Oblig. Law § 5-521(3). The legislature created this exception because it felt that "it would be most inappropriate to permit a usurer to recover on a loan for which he could be prosecuted." *Hammelburger,* 54 N.Y.2d at 590, 446 N.Y.S.2d 917, 431 N.E.2d 278. (citation omitted).

Although corporations like plaintiff can assert criminal usury as a defense, they cannot bring civil claims under the criminal statute. "The statutory exception for interest exceeding 25 percent per annum is strictly an affirmative defense to an action seeking repayment of a loan." *Intima-Eighteen, Inc. v. A.H. Schreiber Co.,* 172 A.D.2d 456, 457568 N.Y.S.2d 802, 804 (1st Dep't 1991) (citations omitted).

*Scantek Med., Inc. v. Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008); *see also Zoo Holdings, LLC v. Clinton*, 11 Misc.3d 1051(A), at *5 (Sup. Ct. N.Y. Cty. Jan. 24, 2006) ("[I]nsofar as the complaint seeks affirmative monetary relief [pursuant to Gen. Oblig. L. § 5-521(3)], plaintiff improperly attempts to use a shield created by the Legislature as a sword.").

Epazz is a corporation.  Therefore, even assuming the Agreements were usurious loans – which they are not – Epazz's claims based on allegations of usury are absolutely barred.  Nor can Epazz evade the statute simply by naming Passley as a Counterclaim Plaintiff, where the allegedly usurious transaction was entered into by Epazz, the corporate entity, not by Passley as an individual.  Passley, in turn, cannot raise a usury claim that was not available to Epazz in the first place.  *Schneider v. Phelps*, 41 N.Y.2d 238, 242 (1977) ("an individual guarantor of a corporate obligation is also precluded from asserting" usury).[3]

---

[3] While the law does not impose a similar absolute bar to Epazz and Passley asserting criminal usury as an affirmative defense, as shown in Point I B., the usury assertion nevertheless fails as a matter of law.

**B.      The Agreement Is Not a Loan and Therefore Cannot Be Usurious**

      **1.      An Agreement Is Only a Loan If the Obligee Has an Absolute Right to Repayment**

Even if Defendants were not absolutely barred from seeking affirmative relief based on usury allegations, the counterclaim is legally insufficient.  That is because it depends on the allegation that the Agreements are loans (and hence potentially subject to usury), when in fact the Agreements, on their face, are purchases and sales of accounts receivable.

As a threshold matter, "[t]here is a strong presumption against the finding of usury." *Transmedia Rest. Co. v. 33 E. 61st St. Rest. Corp.*, 184 Misc.2d 706, 710 (Sup. Ct. N.Y. Cty. Feb. 7, 2000) (citing *Giventer v. Arnow*, 37 N.Y.2d 305, 309 (1975)).  "[U]sury must be proved by clear and convincing evidence as to all its elements and usury will not be presumed." *Hochman v. LaRea*, 14 A.D.3d 653, 654 (2d Dep't 2005).  Here, Defendants invoke the criminal usury statute, N.Y. Penal Law §§ 190.40 and 190.42, which provides that a person is guilty of criminal usury in the second degree where he "knowingly charges, takes or receives … interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum…."  (Counterclaims ¶¶ 11, 114.)  Thus, the statute requires a loan.

The New York Court of Appeals has confirmed this principle: "[u]sury laws apply only to loans or forbearances, not investments.  If the transaction is not a loan, there can be no usury, however unconscionable the contract may be." *Seidel v. E. 17th St. Owners, Inc.*, 79 N.Y.2d 735, 744 (1992) (internal citations and quotations omitted).  *See also Donatelli v. Siskind*, 170 A.D.2d 433, 434 (2d Dep't 1991) ("It is well established that there can be no usury in the absence of a loan or forbearance of money.").

As this Court has observed, "[t]here can be no usury unless the principal sum advanced is repayable absolutely." *Condren v. Grace*, 1990 WL 151108, at *3 (S.D.N.Y. Oct. 4, 1990)

(dismissing complaint alleging that agreement under which obligee would potentially obtain a return in excess of the lawful rate depending on certain contingencies was a usurious loan).[4]  *See also Zoo Holdings*, 11 Misc.3d 1051(A), at *5 ("For a true loan it is essential to provide for repayment *absolutely* and *at all events or that the principal in some way be secured as distinguished from being put in hazard.*" (emphasis added)) (quoting *Rubenstein v. Small*, 273 A.D. 102, 104 (1st Dep't 1947)); *Transmedia*, 184 Misc.2d at 711 ("there can be no usury unless the principal sum advanced is repayable absolutely"); *MoneyForLawsuits V L.P. v. Rowe*, 2012 WL 1068171, at *10 (E.D. Mich. Jan. 23, 2012) (same, applying New York law).  "Where payment or enforcement rests upon a contingency, the agreement is valid even though it provides for a return in excess of the legal rate of interest."  *Prof'l Merch. Advance Capital, LLC v. Your Trading Room, LLC*, 2012 WL 12284924, at *5 (Sup. Ct. Suffolk Cty. Nov. 28, 2012).

In a series of unpublished, but consistent decisions, the state courts have repeatedly held that merchant agreements virtually identical or similar in structure to the Agreement are not loans (and not usurious) because they were not designed to provide the funder with an absolute right of repayment and the payments were at hazard.  For instance, in *Strategic Funding Source, Inc. v. AR Dental Supply Corp.*, Index No. 29923/2008 (Sup. Ct. Kings Cty. Oct. 9, 2009), a Kings County trial court resolved a dispute over an agreement under which the plaintiff had purchased a specified percentage of the defendant's future credit card receivables, up to a fixed maximum.  (Siegelaub Ex. 3, at 2.)  Like the Agreement here, the agreement in that case contained various protections for the purchaser, including a security interest in assets of the

---

[4] Furthermore, a transaction "is not usurious merely because there is a possibility" that the obligee "will receive more than the legal rate of interest."  *Id.* at *3, n.2 (citation omitted).  That is a significant point for this case, because so much of Defendants' argument depends on their assertion that by building into the Agreement terms that reduce the risk that TVT will not be paid, or will have to wait for payment, TVT obtained near certainty of payment.  The legally relevant and dispositive question is whether TVT has a right to "repayment absolutely."

9

seller.  That court determined that the payments to the plaintiff were "genuinely at hazard … because [they] depended on the amount of credit card receivables defendant received month-to-month."  (*Id.* at 10.)  As such, the court concluded that the agreement was "not a disguised loan but [was] instead, as it purport[ed] to be, a sale of future interests in credit card receivables." (*Id.*)  *See also Merch. Capital Access, LLC v. S. Shore Motorsports, LLC*, 2011 WL 3875565 (Sup. Ct. Nassau Cty. Aug. 19, 2011) (parties' agreement contained similar protections for purchaser, including a security interest, a guarantee, as well as representations by the seller similar to those here, with court concluding that it was an agreement to purchase receivables and not a loan).  The *Strategic Funding* Court went on to note that, even when a transaction is a loan, it is not usurious where, as here, the agreement does not specify a deadline by which payment must be made, "but instead was subject to the vagaries of defendant's month-to-month … revenue stream."  (Siegelaub Ex. 3 at 10-11.)

Similarly, just months ago, in *Platinum Rapid Funding Grp. Ltd. v. VIP Limousine Servs., Inc.*, Index No. 604163/2015 (Sup. Ct. Nassau Cty. June 10, 2016), the court rejected a merchant's usury defense where, as here, the "Agreement was for the purchase of future receivables in return for an upfront payment."  (Siegelaub Ex. 4 at 5.)  In that case, as here, the agreement contained a guarantee of performance and representations and warranties limiting the defendant seller's ability to take certain actions with respect to its business.  (*Id.* at 2-3.)  In dismissing usury defenses and counterclaims, the court observed:

> Plaintiff took the risk that there could be no daily receipts, and defendants took the risk that, if receipts were substantially greater than anticipated, repayment of the obligation could occur over an abbreviated period, with the sum over and above the amount advanced being more than 25%.  The request for the Court to convert the Agreement to a loan, with interest in excess of 25%, would require unwarranted speculation, and would contradict the explicit terms of the sale of future receivables in accordance with the Merchant Agreement.

*Id.* at 5.

Even more recently, in *Merch. Cash and Capital, LLC v. Yehowa Med. Servs., Inc.*, Index No. 602039/2016 (Sup. Ct. Nassau Cty. Aug. 2, 2016), another case with similar contractual protections (*i.e.*, a guarantee of performance, etc.), the court dismissed the usury affirmative defense, concluding that "[u]nder the terms of the subject Agreement, if Seller/Defendant produces no daily revenue, no payments are required, and there is no absolute obligation of repayment." (Siegelaub Ex. 5 at 5.)

These cases consistently stand for the principle that sales of receivables in which payment to the purchaser depends on the merchant's collections are not loans.  Although that is enough to decide this case (*i.e.*, because the Agreement expressly *conditions* payment on receipt of payments to Epazz by its customers), the Agreement here is all the more unlike a loan because, as previously noted, it provides for a reconciliation between the amount the merchant collects and its payments of the Specific Daily Amount.  Judge Sullivan of this court addressed the impact of such a provision just one year ago.  *See Prof'l Merch. Advance Capital, LLC v. C Care Servs., LLC*, No. 13-CV-6562 (S.D.N.Y. Aug. 3, 2015) (RJS).  Noting that the agreement in question was structured such that any overpayment by the merchant due to greater than anticipated receivables would be credited back to the merchant, the court held that the agreement was "structured not as a loan but as a sale of accounts receivable."  (Siegelaub Ex. 6 at 1-2.)

> **2.** **The Agreement Does Not Provide Colonial an Absolute Right to Repayment**

The requirement for there to be a loan, with an absolute right to repayment, is fatal to the Counterclaims.  By its express terms, the Agreement does not provide for absolute repayment of a principal sum, and is instead "conditioned upon" and contingent upon the performance of Defendants' business and is subject to a reconciliation (or true-up).  (Counterclaims Ex. A, Doc.

11

8-1, at pages 1 and 3 of 6.)  Thus, the Agreement dictates that the amount and timing of Epazz's payments to TVT depend entirely upon the amount and timing of its receipt of receivables.  The outcomes of those variables could result in payments to TVT over the course of six months, one year, or ten years.  That uncertainty is inherent in the structure of the Agreement.[5]

Because it is uncertain when TVT will be paid (if ever), it also is not possible to determine an interest rate applicable to the transaction.  The Agreement does not state an interest rate, as Defendants admit.  (Counterclaims ¶ 22.)  To them, this means the Agreement is designed to "intentionally mask" that it is really a "usurious loan" (*id.*), but a simpler and more logical conclusion – and the only one warranted on the basis of the allegations or the Agreement – is that the Agreement does not provide for interest, as expressly stipulated by the parties. (Counterclaims Ex. A, Doc. 8-1, at page 3 of 6, § 1.9 ("In no event shall the aggregate of all amounts be deemed as interest hereunder . . .").)  This, too, belies the contention that the Agreement is a loan.  *See Fried v. Bolanos*, 217 A.D.2d 823, 824 (3d Dep't 1995) (no usury where term of the agreement "was not sufficiently definitive to permit a determination of the interest rate…").

3.      **Defendants' Arguments Are Unavailing**

The Counterclaims set forth numerous putative reasons why the Agreement is a "disguised loan," but none has merit.  The core of Defendants' argument, set forth in paragraphs 49-72 of the Counterclaims, is that the "true up" – the clause providing for a reconciliation – is somehow a sham, so that, in reality, Epazz was required to make fixed payments unaffected by

---

[5] For many of the same reasons, Defendants cannot demonstrate Colonial's or TVT's intent to commit usury, another critical element.  *See MoneyForLawsuits*, 2012 WL 1068171, at *11 ("under New York law, intent to overcharge is an essential and necessary element of usury") (internal citations and quotations omitted).  Clearly, Colonial and TVT cannot have intended to commit usury where the agreement is structured such that the payments due were contingent on events outside of their control.

12

its collections, as in a loan.  Absent from the Counterclaims is any allegation that Epazz ever

attempted to exercise its right to a reconciliation, much less that Colonial or TVT denied any

such attempt.  Rather, the allegations consist solely of the opinions of counsel about the meaning

of the contract, rather than alleged facts (beyond the fact that TVT entered into the Agreement

with Defendants and disbursed $600,000 to them).  Each of those opinions, however, is directly

contrary to the language of the Agreement, based on faulty logic, or irrelevant.

      For example, Defendants allege that the true-up is supposedly bogus because TVT "never

refers a merchant to the purported true up" (Counterclaims ¶ 51), ignoring settled New York law

that one who signs a contract is presumed to read and understand it.  *See, e.g.*, *Danann Realty*

*Corp. v. Harris*, 5 N.Y.2d 317, 321 (1959) ("It would be unrealistic to ascribe to plaintiff's

officers such incompetence that they did not understand what they read and signed.").  Nowhere

in the Agreement did TVT or Colonial undertake to explain its provisions to Epazz.  To the

contrary, the Agreement has a merger clause providing that it and the Security Agreement

"embody the entire agreement between Merchant and FUNDER and supersede all prior

agreements and understandings relating to the subject matter hereof."  (Agreement § 4.8.)

Accordingly, any extrinsic evidence that TVT "refer[red] a merchant" to the true-up, or failed to

do so, would be irrelevant.

      Defendants also argue that the true-up is somehow "subordinate" to other terms because

the Agreement states that provisions on subsequent pages are also part of the Agreement.

(Counterclaims ¶ 52.)  That does not mean the true-up is "subordinate."  It means that the terms

of the Agreement must be read together as a whole and reconciled with each other, which is

easily done without in any way "subordinating" any of them.

Nor does the fact that Epazz represented that it had experienced no "material adverse change" since it provided TVT with its financial statements, and that it would notify TVT of any subsequent material adverse change, alter the nature of the Agreement, as Defendants contend. (Counterclaims ¶¶ 52-62.)  Practically any agreement containing representations and warranties will contain a material adverse change clause, to provide assurance that they remain valid, but their existence does not make such agreements loans.

Equally unavailing is Defendants' reliance (Counterclaims ¶ 63 and following) on the fact that the Agreement defines "Events of Default" and provides for remedies if such an event occurs.  The agreement in *Strategic Funding* (Siegelaub Ex. 3 at 2), for example, also contained similar provisions.  Indeed, many kinds of contracts define events of default and predicate remedies upon their occurrence without being loans.  And even if a merchant might feel "forced to continue a losing business because closing shop … is an Event of Default" (Counterclaims ¶ 65), that does not transform the Agreement from a sale into a loan.  It simply means that Epazz, having had the benefit of full performance by TVT, does not have unlimited freedom of choice while performing its obligations.  As the *Strategic Funding* court noted, "those who desire cash in hand may agree to a steep price for an 'advance' on their anticipated future receivables." ((Siegelaub Ex. 3 at 11.)

Defendants' next contention – that the existence of a personal guarantee turns the Agreement into a loan – is nonsense.  (Counterclaims ¶¶ 67, 89-92.)  First, the only guarantees provided for in the Agreement are those that apply upon a default by the merchant.  (*See* Agreement §§ 1.11, 3.2.)  A merchant does not default if it simply misses a payment (or payments) because its collections are slow.  It defaults only by taking other deliberate acts inconsistent with performance of its obligations under the Agreement, which are identified

14

specifically in §§ 1.11 and 3.1.  That a purchaser protects itself against such defaults does not turn a purchase into a loan.  *See Strategic Funding* (Siegelaub Ex. 3) at 9-10 (rejecting merchant's contention that remedies available upon default transform purchase of its receivables into a loan).  Second, the guarantee on its face is one of *performance*, not of payment.

The same reasoning disposes of the rest of the contentions regarding the remedies provided for in the Agreement, such as the grant of a security interest.  (*E.g.*, Counterclaims ¶¶ 79, 88.)  Having a security interest in Epazz's receivables does not eliminate the risk to TVT that Epazz, although not defaulting, will experience a slowdown in anticipated collections.  *See Strategic Funding* (Siegelaub Ex. 3) at 9-10.  That risk differentiates the Agreement from a loan. Similarly, the fact that the Security Agreement reserves all possible remedies upon default by Epazz, including by "acceleration or otherwise," does not mean that the Agreement is a loan. (Counterclaims. ¶ 88; Doc. 8-1 at page 4 of 6.)  It merely means that TVT made its reservation of rights broad, to include the ability to collect the entire Receipts Purchased Amount rather than only the Specified Percentage; but, again, that ability is only triggered if Epazz defaults.

Also erroneous are Defendants' contentions that the Agreement is a loan because TVT does not itself collect the receivables, or request information about the "underlying obligors" rather than about Epazz.  (Counterclaims ¶¶ 74, 78, 98-101.)  There is nothing anywhere to suggest a purchase of future receivables (or other assets) ceases to be a purchase if it does not identify the receivables specifically.  By their nature, most agreements to purchase *future* receivables cannot identify them with specificity, yet they remain purchases.  The courts in the cases reviewed above had no difficulty recognizing this.[6]

---

[6] *See, e.g., Platinum Rapid Funding*, above (Siegelaub Ex. 4) at 5 ("The request for the Court to convert the Agreement to a loan, with interest in excess of 25%, would require unwarranted speculation, and

As for the contention that the Purchase Price is not the "fair market value" of the receivables purchased (Counterclaims ¶ 76), it ignores that Epazz explicitly agreed that it was. Section 1.9 of the Agreement expressly provides that "Merchant agrees that the Purchase Price is in exchange for the sale of future Receipts pursuant to this Agreement [and] equals the fair market value of such Receipts." (Counterclaims Ex. A, Doc. 8-1, at page 3 of 6.)  This is not an assertion that Defendants are free to contradict; it is what they themselves stipulated.

Defendants' remaining arguments consist mainly of word games and logical fallacies. They contend that references to Epazz's obligation to "pay" or provide "payment" somehow mean the Agreement is not a sale.  (Counterclaims ¶¶ 84, 85, 89, 92.)  The word "pay" is merely ordinary English usage in situations where a person is obligated to deliver funds.  There is no legal authority that saying an obligor must "pay" means the obligation is a loan.[7]  Insurers pay policyholders, employers pay employees, buyers pay sellers, and sometimes sellers pay buyers, but that does not turn any of those contracts into loans.  The same goes for Defendants' attempts to make something of the Agreement referring to TVT as "Funder" (Counterclaims ¶ 102) and elsewhere mentioning factoring (id. ¶¶ 13 n.1, 77, 86).  The issue is whether TVT has an absolute right to repayment, and it does not.  As for the allegation that Colonial's Complaint referred to Epazz's "debt owed" to TVT (id. ¶ 108, citing Complaint ¶ 21), the fact is that a party that breaches a contract may easily become a debtor to the other party thereby, without having been a borrower.  And that the guarantee refers to TVT's rights to "renew, extend, or otherwise modify" the Agreement does not mean the Agreement is not a sale.  (Counterclaims ¶¶ 93-94.)

---

would contradict the explicit terms of the sale of future receivables in accordance with the Merchant Agreement.")

[7] Many of Defendants' arguments are based on fallacious reasoning, akin to the failed syllogism that a dog wears a collar; Fluffy the cat is wearing a collar; therefore Fluffy is a dog.  Defendants' contention that debtors must "pay," Defendants must "pay," therefore Defendants are debtors is the same animal.

Sellers may want more time to change the terms in any number of ways, which the broad

wording of the provision permits.  Likewise, the fact that TVT is referred to as "lead purchaser"

does not mean the Agreement is a loan.  (Counterclaims ¶ 103.)  People may pool funds to make

a purchase just as easily as they may do so to make a loan.

### C.    Defendants' Other "Usury"-Based Counterclaims Should Be Dismissed

The Second Counterclaim (Counterclaims ¶¶ 139-40) merely echoes the First

Counterclaim, replacing the word "usury" with "overcharge of interest," but still depending on

being a "loan" that charges usurious "interest."  As set forth above, this Counterclaim fails

because the Agreement is not a loan and does not charge interest, and Defendants in any event

cannot avail themselves of "usury" as a basis for any claim for affirmative relief.

The Seventh Counterclaim, against TVT for rescission (Counterclaims ¶ 165), should be

dismissed for at least three reasons.  First, the only basis alleged for rescission is the

"misrepresentations and other facts averred above," which does not state any basis for rescission

at all; at best, it predicates that demand on the "usury" allegations, which are legally insufficient.

Second, in any event, rescission is merely a form of relief that a court might give, not a cause of

action that should be pled and responded to separately.  *See, e.g.*, *Zola v. Gordon*, 685 F. Supp.

354, 374 (S.D.N.Y. 1988).  Third, there is no allegation of (and no basis to allege) that

Defendants lack an adequate legal remedy, which is necessary to obtain such relief.  *Rudman v.*

*Cowles Commc'ns, Inc.*, 30 N.Y.2d 1, 13 (1972).

The Ninth Counterclaim, against TVT for unconscionability (Counterclaims ¶ 168),

should be dismissed because it, too, depends entirely on prior usury allegations and theories.

Additionally, such a counterclaim would in any event be subject to dismissal because

unconscionability is not an independent claim for relief, but merely a theory that might be

asserted in defense of a breach of contract claim. *See Costoso v. Bank of Am., N.A.*, 74 F. Supp. 3d 558, 573 (E.D.N.Y. 2015).

## II.  THE RICO COUNTERCLAIMS SHOULD BE DISMISSED

### A.  The RICO Counterclaims Fail Because There Is No Collection of an Unlawful Debt

All four of the RICO Counterclaims (Counterclaims Three through Six, ¶¶ 141-64) should be dismissed because they depend on the allegation that Colonial and TVT engaged in the "collection of an unlawful debt," which is based on the erroneous contention that the Agreement is a usurious "loan." *See* Point I.

### B.  The RICO Counterclaims Fail for Numerous Additional Reasons

Even if Defendants' usury theory were viable, their RICO counterclaims fail for other reasons. To state a claim for a civil RICO violation, a plaintiff must allege (1) a substantive violation of 18 U.S.C. § 1962, (2) injury to the plaintiff, and (3) causation of the injury by the defendant's violation. *Commercial Cleaning Servs. L.L.C. v. Colin Serv. Sys., Inc.*, 271 F.3d 374, 380 (2d Cir. 2001). Defendants fail with respect to each requirement.

#### 1.  Substantive RICO Violation

##### a.  The RICO Enterprise

Defendants have insufficiently alleged a substantive RICO violation. Each § 1962 subpart requires the existence of a RICO "enterprise," which is separate and distinct from the RICO "person." As this Court has observed: "[t]o establish liability under Section 1962(c) requires the existence of two distinct entities: (1) a person and (2) an enterprise that is not simply the same person referred to by a different name." *Wild Edibles Inc. v. Indus. Workers of World Local 460/640*, 2008 WL 4548392, at *1 (S.D.N.Y. Oct. 9, 2008). A RICO enterprise is "a group of persons associated together for a common purpose of engaging in a course of conduct,

18

the existence of which is proven by evidence of an ongoing organization, formal or informal, and by evidence that the various associates function as a continuing unit." *First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159, 173 (2d Cir. 2004).  For a group of individuals to constitute an enterprise, they must "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purpose." *Id.* at 174.  Finally, the courts have "long since rejected the idea that a RICO enterprise may consist merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant." *Cruz v. FXDirectDealer LLC*, 720 F.3d 115, 121 (2d Cir. 2013).

Here, Defendants have failed to plead a sufficient enterprise.  Defendants maintain that the enterprise is TVT itself as a standalone entity (Counterclaims ¶ 134), or, alternatively, an amorphously defined "Larger TVT Enterprise," which includes "a non-law firm debt collection firm (upon information and belief [Colonial])."  (*Id.* ¶ 135.)  To the extent that Defendants maintain that TVT is the enterprise, the RICO claims must be dismissed as against TVT, because TVT cannot be both the RICO "person" and the RICO "enterprise."  *See Cruz*, 720 F.3d at 120 ("a corporate person cannot violate the statute by corrupting itself.").  They must likewise be dismissed as against Colonial, because there is not a single averment that Colonial invested illicit income in TVT or acquired an interest in or control of TVT, the specific activities proscribed by §§ 1962(a) and (b) respectively.  *See Ozbakir v. Scotti*, 764 F. Supp. 2d 556, 567 (W.D.N.Y. 2011) (dismissing § 1962(a) and (b) claims because "[t]his case has nothing to do with using racketeering proceeds to operate or take over a legitimate business.")  Nor is there a claim that Colonial somehow conducted the affairs of TVT, as would be required to demonstrate a violation of § 1962(c).  *See Wood v. General Motors Corp.*, 2010 WL 3613812, at *8 (E.D.N.Y. Aug. 23, 2010) ("[I]n order to satisfy [§ 1962(c)], a plaintiff must plead each defendant's participation in

19

the operation or management of an enterprise.")  In fact, other than the passing reference (upon information and belief) to Colonial as perhaps a "non-law firm debt collection firm" that "collet[s] [*sic*] upon" cash advance agreements entered into between TVT and merchants (Counterclaims ¶ 135), the relationship between TVT and Colonial goes unexplored in the 172 paragraphs of Defendants' allegations.

If the RICO claims depend instead upon the "Larger TVT Enterprise," then those claims must be dismissed against all Counterclaim Defendants.  Defendants nowhere allege that the purported members of the "Larger TVT Enterprise" – whose identities remain undefined and whose very existence is pure conjecture – somehow "share a common purpose to engage in a particular fraudulent course of conduct and work together to achieve such purposes." *Cruz*, 720 F.3d at 120.

### b.  Pattern of Racketeering Activity or Collection of Unlawful Debt

Each § 1962 subpart criminalizes proscribed activities where conducted through "a pattern of racketeering activity or collection of unlawful debt."  Defendants maintain that because the Agreements supposedly constitute usurious loans whose enforcement is tantamount to collection of unlawful debts, they need not plead a RICO pattern and predicate offenses. (Counterclaims ¶ 145.)  But even without relying upon the "pattern of racketeering activity" provisions of the statute, Defendants must identify a greater number of offensive transactions than the three isolated Agreements.  A RICO claim based upon "collection of unlawful debts" requires that the loan in question be "incurred in connection with the business of making usurious loans." *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).  This requirement reflects Congress's intent to "exclu[de] from the scope of the statute … occasional usurious transactions by one not in the business of loan sharking." *Id.*  Courts

routinely dismiss RICO claims lacking detailed allegations of a large enough number of usurious loans to demonstrate that the defendant is "in the business of loan sharking."  *See, e.g., Weisel v. Pischel*, 197 F.R.D. 231, 241 (E.D.N.Y. 2000) (summary judgment in favor of defendants where the complaint "allege[d] only that [defendants] were in the business of lending money at a usurious rate," and plaintiffs neglected to "describe other individuals or companies to whom [the defendants] lent money or the usurious interest rates attached to any other loan by the defendants.")  Here, as in *Weisel*, Defendants offer only the barebones allegation that TVT "is in the business of knowingly reaping usurious gains from loans" (Counterclaims ¶ 12) while neglecting to identify any other allegedly usurious transactions.  The Court should dismiss the RICO claims for this independent reason.

Finally, to the extent that Defendants allege as their fallback position a pattern of racketeering activity with mail fraud and wire fraud predicates, the RICO claims still fail because they lack any allegations that could support such predicates.[8]  Moreover, Defendants do not allege the continuity[9] necessary to establish a "pattern" of racketeering activity.  This is yet another independent ground for dismissal of the RICO claims.

---

[8] 18 U.S.C. §§ 1341 and 1343 require, among other things, an intentionally false material representation or omission.  *United States v. Autuori*, 212 F.3d 105, 115-118 (2d Cir. 2000).  Defendants identify no such misrepresentation.  They allege only that Counterclaim Defendants TVT and Andrew Fellus colloquially described the Agreements as "loans," when in fact those agreements are purchases of accounts receivable.  (Counterclaims ¶¶ 119-29.)  Putting aside how their contention conflicts with their claim that the Agreements are usurious loans, Defendants cannot claim that they were misled about the nature of those written agreements, as they possessed and presumptively reviewed them prior to execution.  (Point III, below.)

[9] RICO patterns must be either "closed-ended" or "open-ended."  *Spool v. World Child Int'l Adoption Agency*, 520 F.3d 178, 183-84 (2d Cir. 2008).  Closed-ended continuity requires "a series of related predicates extending over a substantial period of time."  *Id.* at 184.  Open-ended continuity requires a showing that there exists "a threat of continuing criminal activity beyond the period during which the predicate acts were performed."  *Id.* at 185.  Neither is alleged in the Counterclaims.  *See Wild Edibles*, 2008 WL 4548392, at *2.

2.      **Causation and Injury**

RICO causation is both proximate – meaning there was a "direct relationship" between the plaintiff's conduct and defendant's injury – and transactional – *i.e.*, the plaintiff's conduct was a "but for" cause of the injury. *UFCW Local 1776 v. Eli Lilly & Co.*, 620 F.3d 121, 132 (2d Cir. 2010). Even if Defendants had established a substantive RICO violation – which they have not – the absence of a cognizable injury caused by the violation would still prove fatal to the RICO claims. As noted above, §§ 1962(a) and (b) respectively criminalize investment of illicit income in an enterprise and acquisition of a stake in an enterprise via proscribed conduct. Therefore, a "violation [of § 1962(a)] is not established by mere participation in predicate acts of racketeering … a plaintiff must allege injury by reason of defendants' investment of racketeering income in an enterprise." *Ouaknine v. MacFarlane*, 897 F.2d 75, 82-83 (2d Cir. 1990). Section 1962(b) likewise requires that a plaintiff allege injury due to the defendant's acquisition of a stake in the enterprise. *Wood*, 2010 WL 3613812 at *8.

As noted above, apart from rote recital of the magic language (Counterclaims ¶¶ 150-51; 155-56), Defendants offer no allegation that Counterclaim Defendants invested illicit income or acquired a stake in an enterprise. And they certainly do not (nor could they) claim to have suffered an injury caused by a hypothetical investment or acquisition. These deficiencies are fatal to the §§ 1962(a) and (b) claims. *See, e.g.*, *Wood*, 2010 WL 3613812 at *7-8.

Finally, the § 1962(d) conspiracy claim fails both because it consists of nothing but the barest legal conclusions (Counterclaims ¶¶ 163-64) and because the underlying §§ 1962(a), (b) and (c) counterclaims fail. *See, e.g.*, *Fuji Photo Film U.S.A., Inc. v. McNulty*, 640 F. Supp. 2d 300, 312 (S.D.N.Y. 2009); *Wild Edibles*, 2008 WL 4548392, at *3.

## III.   THE FRAUDULENT INDUCEMENT COUNTERCLAIM SHOULD BE DISMISSED

The Eighth Counterclaim, for fraudulent inducement, should be dismissed because the Agreement flatly precludes reliance on the supposed misrepresentations.

The elements of a fraud are well established.  They include: "a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance,  justifiable reliance by the plaintiff and damages."  *Eurycleia Partners, LP v. Seward & Kissel, LLP*, 12 N.Y.3d 553, 559 (2009). Fraud claims are subject to the heightened pleading standard in Fed. R. Civ. P. 9(b), which requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Rombach v. Chang*, 355 F.3d 164, 170 (2d Cir. 2004).  Here, Defendants allege that TVT and Andrew Fellus induced them to enter into the Merchant Agreements by representing that those Agreements were loans, when in fact they are purchases of accounts receivable.  (Counterclaims ¶¶ 119-29.)  Initially, this claim wholly contradicts Defendants' contention that the Merchant Agreements are usurious loans.  If the Agreements were in fact loans, then there could be no fraud involved in representing them as such.  But if the Court concludes – as it should – that the Agreements are not loans, it still must dismiss the fraudulent inducement claim because Defendants cannot assert reliance on statements about the terms and legal classification of the Agreement.  Defendants may not base a fraud claim on the assertion that they failed to read or understand what the text of the Agreement plainly discloses because parties are presumed to read and comprehend the documents they sign.  *See, e.g.*, *Danann*, 5 N.Y.2d at 321.  Moreover, the Agreement states that it embodies the "entire agreement" between the parties.  (Agreement § 4.8)  This negates any reliance on extrinsic terms or statements.  *See Bango v. Naughton*, 184 A.D.2d 961, 963 (3d Dep't 1992) (reliance element

23

of fraud claim unsatisfied where the purportedly fraudulent oral representations conflict with the express written terms of the agreement); *AFG Indus., Inc. v. Empire Glass Co., Inc.*, 226 A.D.2d 487, 487 (2d Dep't 1996) (same); *Glenfed Fin. Corp., Commercial Fin. Div. v. Aeronautics & Astronautics Servs., Inc.*, 181 A.D.2d 575, 576 (1st Dep't 1992) (same).

## IV.  THE PRIMA FACIE TORT COUNTERCLAIM SHOULD BE DISMISSED

The Tenth Counterclaim, for prima facie tort, likewise fails.  New York law is clear that prima facie tort should not be pleaded when there is another cause of action that covers the same allegations.  *See, e.g.*, *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985).  The claim requires a showing of the defendant's "disinterested malevolence" – *i.e.*, that the conduct seeks injury alone.  *See Burns Jackson Miller Summit & Spitzer v. Lindner*, 59 N.Y.2d 314, 333 (1983).  Merely taking Defendants' other defective usury allegations and adding the words "malevolent and malicious purpose" (Counterclaim ¶ 170), with no corresponding basis in allegations of fact, does not suffice to plead another tort.

## V.  MOST OF THE AFFIRMATIVE DEFENSES SHOULD BE DISMISSED

In their Answer to Colonial's Complaint, Defendants pled defenses (Answer ¶¶ 45-59) that should be dismissed because they fail for the same reasons the corresponding Counterclaims fail, or for other reasons based on documents they appended to the Counterclaims.

The First, Twelfth, Thirteenth and Fourteenth Defenses (based on the Agreement being a usurious loan) should be dismissed for the reasons given in Point I.

The Second Defense ("standing") should be dismissed because its stated basis – that Colonial "is not a party to the agreements allegedly breached" (Answer ¶ 47) – contradicts Defendants' agreement that Colonial is the authorized servicing agent for TVT.  (Counterclaims Ex. A, Doc. 8-1, at page 5 of 6.)

24

The Seventh Defense (contending that Colonial and TVT failed to mitigate damages by collecting the receivables) (Answer ¶ 52) should be dismissed because it is contrary to the express terms of the Agreement, under which the obligation to collect rests solely on Defendants. (Counterclaims Ex. A, Doc. 8-1, at page 1 of 6.)  Likewise, the Eighth Defense, contending that Defendants are not liable for conduct for which attorneys' fees may be awarded (*id.* ¶ 53) fails because the Agreement (§ 1.11) expressly provides for an award of attorneys' fees in the event Defendants breach.

The Ninth and Tenth Defenses (fraud) should be dismissed for the reasons set forth in Point III.

The Eleventh Defense ("rescission") should be dismissed for the same reasons the "rescission" Counterclaim should be dismissed, as discussed in Point I.C.

## CONCLUSION

For all of the foregoing reasons, the Counterclaims and Affirmative Defenses Nos. 1, 2, and 7-14 should be dismissed in their entirety, with prejudice.

Dated:  September 30, 2016
        New York, New York

By: */s/ Richard J. Howard*____

Richard J. Howard
Colonial Funding Network, Inc.
120 West 45th Street
New York, New York 10036
(212) 354-1400
*Attorney for Colonial Funding Network, Inc.*

By: */s/ David A. Picon*_____

David A. Picon
Matthew J. Morris
Jonathan E. Siegelaub
Proskauer Rose LLP
Eleven Times Square
New York, New York 10036
(212) 969-3000
*Attorneys for  Colonial Funding Network, Inc.*
*and TVT Capital LLC*

25