UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------------x
COLONIAL FUNDING NETWORK, INC. as servicing
provider for TVT CAPITAL, LLC,

                                                          Case No. 16-cv-05948 (LLS)

                Plaintiff,

   - against -

EPAZZ, INC.
CYNERGY CORPORATION and
SHAUN PASSLEY (A/K/A SHAUN A. PASSLEY),

                Defendants.
-----------------------------------------------------------------------x
EPAZZ, INC. and SHAUN PASSLEY,

                Counterclaim Plaintiffs,

   - against -

TVT CAPITAL LLC, VANTIFF, LLC,
COLONIAL FUNDING NETWORK, INC.,
ANDREW FELLUS, WARREN FELLUS,
JOHN DOES 1-10, and JANE DOES 1-10,

                Counterclaim Defendants.
-----------------------------------------------------------------------x

## EPAZZ, INC., CYNERGY CORPORATION, AND SHAUN PASSLEY'S MEMORANDUM OF LAW IN OPPOSITION TO MOTION TO DISMISS DEFENSES AND COUNTERCLAIMS

**JONATHAN M. PROMAN, ESQ.**
30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com
*Attorneys for Defendants/Counterclaim Plaintiffs*
*Epazz, Inc., Cynergy Corporation, and Shaun Passley*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. i

PRELIMINARY STATEMENT............................................................................. 1

PERTINENT FACTS....................................................................................... 1

    I.    INTRODUCTION—RATHER THAN ACCEPT THE COUNTERCLAIM PLAINTIFFS'
        AVERMENTS AS TRUE, THE DISMISSAL MOTION CONTRADICTS THEM....................... 1

    II.   EPAZZ, INC. SOUGHT ONLY LOANS, AND AGREED TO ENTER INTO ONLY LOANS
        TO WHICH USURY LAW IMPOSES AN INTEREST RATE CAP, NOT TO SELL
        ITS FUTURE ACCOUNTS RECEIVABLE.......................................................... 2

ARGUMENT................................................................................................ 9

    I.    THE COUNTERCLAIMS PROPERLY AVER
        THAT THE MERCHANT AGREEMENTS ARE USURIOUS................................... 9

        A.  USURERS IN NEW YORK AND ELSEWHERE HAVE BEEN HELD ACCOUNTABLE
            FOR MASQUERADING AS ACCOUNTS RECEIVABLE PURCHASERS...................... 9

        B.  THE ENTIRE TRANSACTION CONTROLS ITS TRUE NATURE.................................. 9

    II.   OVERCHARGE OF INTEREST AND USURY ARE AFFIRMATIVE CLAIMS.......................... 13

    III.  TAKING OR RECEIVING GAINS EXCEEDING 25%
        IS USURIOUS—HYPOTHETICAL ALTERNATIVES ARE IRRELEVANT............................. 14

    IV.  ISOLATED DISCLAIMERS RENOUNCING LOANS ARE INEFFECTIVE BECAUSE
        THEY CONTRADICT THE LOAN APPLICATION, TVT CAPITAL'S LOAN
        REPRESENTATIONS, AND THE TOTALITY OF AN AGREEMENT'S TEXT........................ 16

    V.   UBIQUITOUS LOAN LANGUAGE USED ELSEWHERE IN THE AGREEMENT
        IS CONSISTENT WITH THE LOAN APPLICATION AND LOAN REPRESENTATIONS........... 20

    VI.  OTHER MERCHANT AGREEMENT TERMS EVIDENCING THAT
        TVT CAPITAL INTENTIONALLY MADE LOANS............................................... 24

    VII. DECISIONS FROM THIS COURT AND OTHERS SUPPORT THE COUNTERCLAIMS............ 31

    VIII. RICO CLAIMS WERE PROPERLY PLEADED.................................................... 37

        A.  INCORRECT FACTS AND LAW TAINT THE DISMISSAL MEMORANDUM'S
            RICO TREATMENT.......................................................................... 37

B.  RICO's Four Bases for Liability........................................................................ 42

C.  The § 1962(a) Claim...................................................................................... 44

D.  The § 1962(b) Claim...................................................................................... 45

E.  The § 1962(c) Claim....................................................................................... 46

F.  The § 1962(d) Claim...................................................................................... 46

IX.   Rescission was Properly Pleaded........................................................................ 48

X.   Fraudulent Inducement Voids the Agreements.................................................... 51

XI.   Unconscionability Applies Even if the Agreements are Not Loans
and Not Rescinded................................................................................................ 51

XII.  Prima Facie Tort Was Properly Pleaded.............................................................. 52

XIII. Good Faith and Fair Dealing Applies.................................................................. 53

XIV. Defenses Were Properly Pleaded........................................................................ 54

A.  Usury (First Defense)..................................................................................... 54

B.  Colonial Funding Lacks Standing (Second Defense).................................... 54

C.  Duty to Mitigate (Seventh Defense).............................................................. 56

D.  Attorneys' Fees are Improperly Claimed (Eighth Defense)........................ 57

E.  Fraud, Rescission, and Unconscionability
(Ninth Through Twelfth Defenses)................................................................ 57

F.  Licensed Lender Law (Thirteenth Defense).................................................. 57

G.  Estoppel (Fourteenth Defense)...................................................................... 58

Conclusion.......................................................................................................................... 59

## TABLE OF AUTHORITIES

FEDERAL CASES

*Aaron v. Mattikow*, 146 F. Supp. 2d 263 (E.D.N.Y. 2001)..................................................... 10, 19

*Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40 (2d Cir. 1991)................................................ 48

*Aller v. United States*, 646 Fed. Appx. 21 (2d Cir. 2016)......................................................... 9

*American Acceptance Corp. v. Schoenthaler*, 391 F.2d 64 (5th Cir. 1968)............................. 16

*Beck v. Prupis*, 529 U.S. 494 (2000)........................................................................................ 39

*Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565 (S.D.N.Y. 1999)................ 45

*Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.,* 310 F. Supp. 2d 556 (S.D.N.Y 2003)............ 10

*Brodie v. Schmutz (In re Venture Mort. Fund, L.P.)*, 282 F.3d 185 (2d. Cir. 2002)............ 11–12

*Carlone v. Lion & The Bull Films, Inc.*, 861 F. Supp. 2d 312 (S.D.N.Y. 2012)....................... 11

*Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206 (S.D.N.Y. 2007)............... 49

*Chambers v. Time Warner, Inc.*, 282 F.3d 147 (2d Cir. 2002)................................................. 3

*City of New York v. Bello*, 579 Fed. Appx. 15 (2d Cir. 2014).................................................. 47

*Cook v. Easy Money of Kentucky, Inc.*, 196 F. Supp. 2d 508 (W.D. Ky. 2001)...................... 44

*Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411 (2d Cir. 2015)................. 55

*Fierro v. Gallucci*, 2008 U.S. Dist. LEXIS 38513 (E.D.N.Y. May 12, 2008)........................ 48

*Fleishman v. Hyman*, 2004 U.S. Dist. LEXIS 19793 (S.D.N.Y. Sept. 30, 2004).......... 10, 38, 40

*Garcia v. Valdes (In re Garcia)*, 167 B.R. 341 (Bankr. E.D.N.Y. 1994)................................ 13

*Harbinger Capital Partners LLC v. Deere & Co.*, 632 Fed. Appx. 653 (2d Cir. 2015)......... 58

*Hemi Group, LLC v. City of New York*, 559 U.S. 1 (2010).................................................. 39, 42

*Hershey Foods Corp. v. Collegiate Mktg.*,
    1996 U.S. Dist. LEXIS 17698 (S.D.N.Y. Nov. 25, 1996)............................................ 49

*Holloway v. King,* 361 F. Supp. 2d 351 (S.D.N.Y. 2005)....................................................... 51

i

*Hornblower & Weeks, Inc. v. Blue Marlin Breweries, Inc.*,
　　2000 U.S. Dist. LEXIS 13748 (S.D.N.Y 2000)............................................................. 15

*King v. Wang*, 2016 U.S. App. LEXIS 15753 (2d Cir. Aug. 26, 2016).................................... 39

*Klehr v. A.O. Smith Corp.*, 521 U.S. 179 (1997)......................................................... 38

*Kosakow v. New Rochelle Radiology Assocs., P.C.*, 274 F.3d 706 (2d Cir. 2001)................. 58

*Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326 (S.D.N.Y. 2002)...... 51

*Leasco Corp. v. Taussig*, 473 F.2d 777, 783 (2d Cir. 1972)........................................ 50

*McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232 (S.D.N.Y. 2006)................................. 49

*Merchant Cash & Capital LLC v. Edgewood Group., LLC*,
　　2015 U.S. Dist. LEXIS 94162 (S.D.N.Y. July 2, 2015)........................................... 31–32

*Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243 (S.D.N.Y. 2006)............................ 48

*Peters Fabrics, Inc. v. Textiles Fabricato de Nicaragua, S.A.*,
　　1985 U.S. Dist. LEXIS 20737 (S.D.N.Y. Apr. 15, 1985)............................................ 40

*Professional Merch. Advance Capital, LLC v. C Care Servs., LLC*,
　　2015 U.S. Dist. LEXIS 92035 (S.DN.Y. July 15, 2015)........................................ 11, 33

*Ritchie v. Gano*, 2008 U.S. Dist. LEXIS 67770 (S.D.N.Y. Sept. 8, 2008).............................. 50

*RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090 (2016)..................................... 39

*Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89 (2d Cir. 2007)...................... 54, 56

*Trustees of the ALA-Lithographic Pension Plan v. Crestwood Printing Corp.*,
　　127 F. Supp. 2d 475 (S.D.N.Y. 2001)........................................................... 49

*Versatile Housewares & Gardening Sys. Inc. v. Thill Logistics, Inc.*,
　　819 F. Supp. 2d 230 (S.D.N.Y. 2011)........................................................... 56

*Watkins v. Guardian Loan Co. of Massapequa, Inc. (In re Watkins)*, 240 B.R. 668
　　(Bankr. E.D.N.Y. 1999)........................................................................ 58

*Wild Edibles Inc. v. Industrial Workers of the World Local 460/640*,
　　2008 WL 4548392 (S.D.N.Y. Oct. 9, 2008)....................................................... 43

*United States v. Cain*, 671 F.3d 271 (2d Cir. 2012)................................................ 39

*United States v. Giovanelli*, 945 F.2d 479 (2d Cir. 1991).................................................. 38, 40

*United States v. Krasniqi*, 555 Fed. Appx. 14 (2d Cir. 2014)................................................ 41

*United States v. Lee*, 2016 U.S. App. LEXIS 15542 (2d Cir. Aug. 24, 2016)........................ 41

*United States v. Yannotti*, 541 F.3d 112 (2d Cir. 2008)........................................................ 47

*U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428 (S.D.N.Y. 2010)........ 56

*Yurman Design, Inc. v. Garden Jewelry Mfg. Corp.*,
2003 U.S. Dist. LEXIS 15051 (S.D.N.Y. Aug. 29, 2003)............................................. 50

<u>STATE CASES</u>

*Abir v. Malky, Inc.*, 59 A.D.3d 646, 873 N.Y.S.2d 350 (2d Dep't 2009)................................ 11

*Alpha Capital Anstalt v. bioMetrix Inc.*,
2010 N.Y. Misc. LEXIS 1265 (Sup. Ct. Suffolk Co. Jan. 6, 2010)............................. 12

*Bouffard v. Befese, LLC*, 111 A.D.3d 866, 976 N.Y.S.2d 510 (2d Dep't 2013).................. 10–11

*Clever Ideas, Inc. v. 999 Restaurant Corp.*,
2007 N.Y. Misc. LEXIS 9248 (Sup. Ct. NY Co. Oct. 12, 2007)............................ 34, 36

*Englishtown Sportswear, Ltd. v. Marine Midland Bank*,
97 A.D.2d 498, 467 N.Y.S.2d 693 (2d Dep't 1983)...................................................... 13

*Fareri v. Rain's Int'l, Ltd.*, 187 A.D.2d 481, 589 N.Y.S.2d 579 (2d Dep't 1992).................. 11

*Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*,
46 N.Y.2d 573, 389 N.E.2d 113, 415 N.Y.S.2d 800 (1979)......................................... 28

*Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*,
128 A.D.3d 1007, 9 N.Y.S.3d 682 (2d Dep't 2015).................................... 20

*Hamilton Capital VII, LLC v. Khorrami, LLP*,
2015 N.Y. Misc. LEXIS 2954 (Sup Ct. NY Co. Aug. 17, 2015).............................. 6, 25

*Le Chase Data/Telecom Servs., LLC v. Goebert*,
6 N.Y.3d 281, 844 N.E.2d 771, 811 N.Y.S.2d 317 (2006)........................................ 6, 25

*Matias v. Arango*, 289 A.D.2d 459, 735 N.Y.S.2d 157 (2d Dep't 2001)................................ 15

*Oliveto Holdings, Inc. v. Rattenni*, 110 A.D.3d 969, 973 N.Y.S.2d 321 (2d Dep't 2013)........ 11

*People v. Service Inst., Inc.,*
    101 Misc. 2d 549, 421 N.Y.S.2d 325 (Sup. Ct. Suffolk Co. 1979)................................ 34

*Qualis Care, L.P. v. Everglades Reg'l Med. Ctr., Inc.,*
    232 A.D.2d 323, 648 N.Y.S.2d 580 (1st Dep't 1996).................................... 12

*Rebeil Consulting Corp. v. Levine*, 208 A.D.2d 819, 617 N.Y.S.2d 830 (2d Dep't 1994)....... 14

*Sandra's Jewel Box Inc. v. 401 Hotel, L.P.,*
    273 A.D.2d 1, 708 N.Y.S.2d 113 (1st Dep't 2000).................................... 51

*Simsbury Fund, Inc. v. New St. Louis Associates,*
    204 A.D.2d 182, 611 N.Y.S.2d 557 (1st Dep't 1994)............................ 15, 20

*Strategic Funding Source, Inc. v. AR Dental Supply Corp.,*
    Index No. 29923/08 (Sup. Ct. Kings Co. Oct. 9, 2009)................................ 37

*Tower Funding, Ltd. v. David Berry Realty, Inc.,*
    302 A.D.2d 513, 755 N.Y.S.2d 413 (2d Dep't 2003).................................... 9

*Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp.,*
    184 Misc. 2d 706, 710 N.Y.S.2d 756 (Sup. Ct. NY Co. 2000).................................... 36

FEDERAL STATUTES

18 U.S.C. § 2................................................................................................ 44

18 U.S.C. § 1961........................................................................... *passim*

18 U.S.C. § 1962........................................................................... *passim*

STATE STATUTES

CPLR § 215................................................................................................ 13

Penal Law § 190.40........................................................................... 14–15

FEDERAL RULES

FED. R. CIV. P. 17................................................................................ 55

OTHER AUTHORITIES

RICHARD A. GREENBERG, 6 NEW YORK CRIMINAL LAW § 19:14 (3d ed. 2014)...................... 10

## PRELIMINARY STATEMENT

Ignoring counterclaim averments -- the very assertions that must be accepted as true -- taints much of Colonial Funding Network, Inc. and TVT Capital LLC's dismissal motion.  Usury presents the greatest peril to the counterclaim defendants because it is a felony.  The movants ignore decisions from Judge Sullivan and Magistrate Judge Freeman of this Court that have applied a usury analysis to "merchant agreements," as other jurists have, because New York requires a transaction to be viewed as a whole.  The movants, in contrast, block quote two contract provisions disclaiming usury, while deemphasizing or disregarding most of the document upon which the counterclaims rely and New York law places emphasis upon.  The movants also wrongly state applicable law in material respects.

Counterclaims such as rescission exist independent of usury, and their strength is not affected by the movants largely disregarding lack of mutual assent, unilateral mistake, and fraud— each a basis to cancel the transactions in the event the Court concludes a funder's gain under the agreements are beyond usury proscriptions' reach.  The dismissal motion's assertion that only "supposed oral representation[s]" are averred is another wrong statement because averments include a written Loan Application provided to, and submitted by, Epazz, Inc., and written representations that a loan would be made.  New York enforces contracts based on actual agreement, does not bind a party to a fraud, and those principles override a general merger clause.

## PERTINENT FACTS

### I.  Introduction—Rather Than Accept the Counterclaim Plaintiffs' Averments as True, the Dismissal Motion Contradicts Them

The dismissal motion contradicts Epazz, Inc. and Shaun Passley's pleading.  For example, the movants represent as "undisputed" that Epazz received $600,000.  But Epazz and Shaun

Passley aver Epazz did *not* receive $600,000 from TVT Capital LLC or its participant funders.[1]

So too does the dismissal memorandum incorrectly assert (p. 3) that TVT Capital made only "supposed oral representations" that a merchant agreement is a loan. The counterclaims aver (among other things) that a written "Loan Application" was given by TVT Capital to Epazz as a condition precedent to the transactions, and that the transactions are based on that Loan Application. Counterclaims ¶¶ 119–21. The counterclaims even quote the Loan Application, which discusses "credit," "repayment," and the "loan amount." Counterclaims ¶¶ 119–121. Specific e-mail loan representations are further averred in the counterclaims (counterclaims ¶¶ 122–24), contradicting (again) the movants' purported factual recitation of only "supposed oral representations."

The counterclaims aver too that in practice (regardless of any ink on paper TVT Capital emphasizes so heavily in litigation) TVT Capital does not permit a merchant to avail itself of purported account reconciliation. Counterclaims ¶¶ 55–61. A synopsis of the counterclaim's real content follows.

## II. Epazz, Inc. Sought Only Loans, and Agreed to Enter Into Only Loans to Which Usury Law Imposes an Interest Rate Cap, Not to Sell Its Future Accounts Receivable

Epazz, Inc., a small business selling software, network services, and similar products, during late 2015 contacted financial institutions to obtain loans. Counterclaims ¶ 1. Unsolicited phone calls followed from persons identifying themselves as loan brokers or lenders. Counterclaims ¶ 1. TVT Capital is an entity that contacted Epazz marketing loans. Counterclaims ¶¶ 1, 119–29.

---

[1] *Compare* answer (p. 7, sixth defense), "Defendants did not receive the full or proper amount of the alleged 'Purchase Price' stated in each of the agreements [*i.e.*, did not receive $600,000] ...." *with* dismissal memorandum (p. 1), "It is undisputed that TVT advanced $600,000 to Epazz ....", and (p. 3), "The Counterclaims allege that … TVT disbursed a total of $600,000 to Epazz pursuant to three merchant agreements ...."

2

Epazz sought a loan only—it did not intend, or ever consider, entering into a transaction other than a loan, much less one under which a funder may receive an approximately 49% return in about two to six months (equating to 98%–294% annually).  Counterclaims ¶ 114.  Epazz's principal, Shaun Passley, was aware at all pertinent times that the return to a lender would be capped by usury proscriptions, and that was part of the reason he sought a loan only.  Counterclaims ¶ 114.[2]

After TVT Capital contacted Epazz, it was told by Shaun Passley that Epazz wanted a loan.  Counterclaims ¶ 1.  TVT Capital represented to Epazz that it made loans, and would make a loan to Epazz subject to Loan Application approval.  Counterclaims ¶¶ 1, 127–28.  TVT Capital provided to Epazz a document titled, in bold, large-font letters, "Loan Application."  Counterclaims ¶¶ 111, 119.  The Loan Application is attached as Exhibit A to the accompanying Declaration of Shaun Passley, dated October 31, 2016 (the "Passley Dec.").[3]

The Loan Application states (among other things) at the bottom left side of the document:

> By signing & faxing or emailing us your application, you certify that (i) you are authorized to apply on behalf of the company whose full legal name appears above under the Company Information portion of the ***Loan Application*** for a ***business loan from us*** ....  You understand & agree that we and our agents and assignees are authorized to contact 3rd parties to make inquiries in evaluating your ***Loan Application*** (including requesting business & personal credit bureau reports from credit reporting agencies and other sources) ....  You understand and agree that we may provide credit & other information from the ***Loan Application*** … with 3rd parties who may use the information [for] any lawful purpose, including for the purpose of offering credit ....

Passley Dec. Ex. A (bottom left side of document) (emphasis added).

---

[2] Mr. Passley is a non-lawyer but has completed a two-year, part-time Master of Laws program.

[3] The dismissal memorandum (p. 6) correctly states that upon a dismissal motion documents referred to in a pleading, such as the Loan Application, may be considered.  *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152–53 (2d Cir. 2002) (documents referred to in a pleading may be considered upon a dismissal motion).

TVT Capital's Loan Application states too that it is an application for "credit"; and that "repayment" was the reason for information requested by that Loan Application. Counterclaims ¶ 120; Passley Dec. Ex. A (top left side of the Loan Application) ("If you are applying for individual *credit* in your name and are relying on your own income or assets … for *repayment* complete Owner Information (1)" and, "If this is an application for joint *credit* with another person, complete Owner Information (1) and (2).") (emphasis added). The Loan Application required Epazz to complete a field titled, "Loan Amount Requested." Passley Dec. Ex. A (right hand side of the Loan Application, around the middle of the page). Never did TVT Capital request that Epazz sell future accounts receivable. Counterclaims ¶¶ 127–28.

Other loan-only representations from TVT Capital include an e-mail to Shaun Pasley, dated December 22, 2015, at 2:01pm, from Andrew Fellus, who is affiliated with TVT Capital, in which Fellus discussed a "loan amount" to one of Passley's companies. Counterclaims ¶ 122. Fellus also referred to a potential "loan amount" in an e-mail to Shaun Passley dated December 15, 2015, at 2:50pm, discussing Passley's requests for a loan. Counterclaims ¶ 123. Fellus, in an e-mail to Shaun Passley dated November 2, 2015, at 2:09pm, also referred to a "loan" as the product he was offering. There, he requested a "loan app" from Passley for potential funding of Passley-owned entities. Counterclaims ¶ 124. Because of (among other things) the "loan amount" references, Epazz believed that TVT Capital would make a loan to it, not that Epazz would purportedly sell future accounts receivable or engage in any other transaction. Counterclaims ¶ 123. During phone calls with TVT Capital personnel before the merchant agreements were entered into, Shaun Passley was further told by TVT Capital representatives that TVT Capital would make a "loan" to Epazz. Counterclaims ¶ 129.

4

The Loan Application was the only written application of any kind submitted by Epazz to TVT Capital. Counterclaims ¶ 119. Epazz did not submit an application to sell future accounts receivable. Counterclaims ¶ 115. It did not submit an application for any other transaction. The merchant agreements are a result of the Loan Application. Counterclaims ¶ 119.

TVT Capital's representations that it makes loans, and would make one to Epazz subject to Loan Application approval, were made in order to induce Epazz and Shaun Passley's reliance on them, by causing the counterclaim plaintiffs to believe they would receive loans. Counterclaims ¶¶ 111–12, 118. Epazz and Shaun Passley when deciding to enter into the merchant agreements did rely upon TVT Capital's representations that it makes loans, and would make a loan to Epazz, because those representations caused Epazz to enter into the transactions, as Epazz believed it would receive a loan to which usury proscriptions apply. Counterclaims ¶¶ 113, 116–117.

Although Epazz and Shaun Passley did not assent to sell future accounts receivable because they sought loans only, no matter what an agreement is called, they would not have assented to a transaction under which a funder may acquire an approximately 49% cash gain in about two to six months (equating to 98%–294% annually), because Epazz and Shaun Passley believe such gain is excessive. Counterclaims ¶ 115–16.

TVT Capital understands fully penal law's usury proscriptions. Counterclaims ¶ 12. The reason for its making loan representations but later purporting that a merchant has sold future accounts receivable is to acquire gains of approximately 49% over two to six months from those who would otherwise not enter into such transaction. Counterclaims ¶ 12. TVT Capital could have told Epazz and Shaun Passley that it wished Epazz to sell future accounts receivable; and provided an "Application to Sell Future Accounts Receivable," rather than the Loan Application, but it did not. Counterclaims ¶¶ 125–28.

TVT Capital during contract-formation discussions never refers (directly or indirectly) to account reconciliation—let alone that account reconciliation purportedly makes the subject of the Loan Application not a loan.  Counterclaims ¶ 51.  TVT Capital never refers to a provide-all-bank statements monthly obligation, or that failure to do so once locks a merchant into fixed per-business day repayments guaranteeing an approximately 49% return to TVT Capital over a two to six month fixed period (equating to 98%–294% annually).  Counterclaims ¶ 51.  TVT Capital when entering into a merchant agreement has already examined as part of its underwriting a merchant's receivables and sales, and knows those will support the per-business day repayment amount over the short life of a merchant agreement and that account reconciliation is academic to a transaction in practice.  Counterclaims ¶ 51.  Even if a material receivables collection change did occur, TVT Capital's regular practice is not to honor an account reconciliation request, but to claim (among other things) forfeiture of that right because of, for example, want of reporting in advance a material change in business before the receivables decline occurs.  Counterclaims ¶¶ 58–61.

A merchant agreement's title says, in prominent type, it is a "Revenue Based Factoring (RBF/ACH) Agreement."  Passley Dec. Ex. B (three form merchant agreements that are the subject of this action).  Factoring is making a loan.[4]

---

[4] *Shanghai Weiyi Int'l Trade Co., Ltd. v. Focus 2000 Corp.*, 2015 U.S. Dist. LEXIS 141808, at *6 (S.D.N.Y. Oct. 16, 2015) ("[Under] standard factoring agreements ... [the factor] lends money to [borrowers], which in turn 'sell and assign' their accounts receivable to [the factor and that factor] ... retains a security interest in all of [the borrower's] existing and after-acquired accounts receivable ... [and the factor] perfect[s] its security interest in that collateral by filing UCC financial statements ...."); *Midlantic Commer. Co. v. Prime Sportswear Corp.*, 1999 U.S. Dist. LEXIS 13238, at *2 (S.D.N.Y. Aug. 25, 1999) ("[A] commercial lender ... entered into a factoring agreement ... [p]ursuant to [which the factor] loaned money to [a manufacturer] and [the manufacturer] assigned all its accounts receivable [to the factor] ... [and] [t]o further secure its loans ... [the factor] took a security interest in, inter alia, [the manufacturer's] accounts, and the proceeds thereof."); *Le Chase Data/Telecom Servs., LLC v. Goebert*, 6 N.Y.3d 281, 284, 844 N.E.2d 771, 772, 811 N.Y.S.2d 317, 318 (2006) ("[A] factor [is] a company that lends money to others on the security of their accounts receivable."); *Hamilton Capital VII, LLC v. Khorrami, LLP*, 2015 N.Y. Misc. LEXIS 2954, at *1–2 (Sup Ct. NY Co. Aug. 17, 2015) (lender "essentially functions as a factor; that is, it lends money ... and the loans are secured by the [borrower's] accounts receivable").

6

This Court's August 9, 2016 order [docket no. 7], based upon its review of the merchant agreements, stated those agreements were "Revenue Based Factoring" agreements, under which the plaintiff "seeks to collect money owed." Passley Dec. Ex. C p. 1. The Court did not state an agreement was a sale by Epazz of its future accounts receivable.

Because, as the counterclaims aver (¶¶ 12, 22), TVT Capital intends to commit usury, a merchant agreement does not contain ink on paper saying it charges interest. It does use the words "Specified Percentage"—followed by a number always appearing as a lawful interest rate would. Counterclaims ¶¶ 31–32; Passley Dec. Ex. B p. 1.

The principal amount of money allegedly given to a merchant under the agreements is the "Purchase Price." Counterclaims ¶¶ 24–27; Passley Dec. Ex. B p. 1. The repayment amount is deemed to be the "Receipts Purchased Amount." Counterclaims ¶¶ 28–30; Passley Dec. Ex. B p. 1. The Purchase Prices and Receipts Purchased Amounts in this action are:

| Date of Agreement | Purchase Price (amt of funds allegedly given) | Receipts Purchased Amount (repayment amt) |
|---|---|---|
| 12/02/2015 | $100,000.00 | $149,000.00 |
| 01/07/2016 | $150,000.00 | $224,850.00 |
| 01/28/2016 | $350,000.00 | $524,650.00 |

Counterclaims ¶ 30; Passley Dec. Ex. B pp. 1, 7, 13.

TVT Capital's total gain of approximately 49% per merchant agreement (equating to 98%–294% annually) is nowhere stated on the agreement, but must be calculated by the reader. Counterclaims ¶¶ 31–32; Passley Dec. Ex. B.

The per-business day repayment obligation upon a merchant is called the "Specific Daily Amount." Counterclaims ¶ 34; Passley Dec. Ex. B p. 1. The documents that are the subject of this action contain the following Specific Daily Amounts:

| Date of Agreement | Purchase Price | Receipts Purchased Amount | Specific Daily Amount (per-business day repayment obligation) |
|---|---|---|---|
| 12/02/2015 | $100,000.00 | $149,000.00 | $2,439.00 |
| 01/07/2016 | $150,000.00 | $224,850.00 | $2,439.00 |
| 01/28/2016 | $350,000.00 | $524,650.00 | $2,915.00 |

Counterclaims ¶ 37; Passley Dec. Ex. B pp. 1, 7, 13.

Repayment time frames through Specific Daily Amount payments under the merchant agreements are:

- 61 business days ($149,000 repayment amount with $2,439 daily obligation)—approximately 49% gain;

- 92 business days ($224,850 repayment amount with $2,439 daily obligation)—approximately 49.9% gain; and

- 180 business days (524,650 repayment amount with $2,915 daily obligation)—approximately 49.9% gain.

The purported availability of account reconciliation, the movants assert, is the only thing potentially making the agreements not loans. At all pertinent times TVT Capital did require payment of the Specific Daily Amount from Epazz each business day. Counterclaims ¶ 42.

8

## ARGUMENT

### I.  The Counterclaims Properly Aver That the Merchant Agreements are Usurious

#### A.  *Usurers in New York and Elsewhere Have Been Held Accountable For Masquerading as Accounts Receivable Purchasers*

Usury done overtly is conduct easily assailed.  Entities intending usury, case law has shown, often renounce making loans through isolated loan-denying provisions, just as TVT Capital does, to try to effect the act.  But scrutiny under New York law requires a transaction to be assessed as a whole to determine whether it is a loan.  That case law includes (i) decisions from Judge Sullivan and Magistrate Judge Freeman of this Court; and (ii) New York State Supreme Court cases—including one upholding a criminal indictment against a purported accounts receivable purchaser.  Out-of-state cases too have found purported accounts receivable purchasers to have run afoul of usury.  The movants likely know of each of the above cases because they have been raised in the parallel Shaun Passley merchant agreement action to which the dismissal memorandum (p. 3 n.2) refers.[5]

#### B.  *The Entire Transaction Controls Its True Nature*

As a threshold matter, a corporation (not just natural persons) may assert usury under Penal Law § 190.40.  *Tower Funding, Ltd. v. David Berry Realty, Inc.*, 302 A.D.2d 513, 514, 755 N.Y.S.2d 413, 415 (2d Dep't 2003) (although civil usury proscriptions are inapplicable to a corporation, "the prohibition against [a corporation] asserting [usury] does not apply to ... criminal usury where interest in excess of 25% per annum is knowingly charged") (citations omitted).

---

[5] As averred in the counterclaims (¶ 1), TVT Capital contacted Epazz offering loans, but there were other callers. Certain of those entities required in connection with a merchant agreement not only a security interest in the business's assets and a Shaun Passley guaranty, but required affidavits of confession of judgment.  Those merchant agreements are the subject of the parallel litigation, commenced in state court in order to vacate judgments by confession entered by the Westchester County Clerk, in addition to voiding the merchant agreements and to obtain other relief.  An amended complaint will be submitted in the Westchester County action, but the dismissal motion attached the original complaint, prepared on an emergency basis together with a motion by order to show cause for a temporary restraining order and preliminary injunction enjoining enforcement of the judgments by confession.

To determine whether an agreement is usurious under New York law, the entire transaction must be assessed (not just isolated loan-denying provisions).  Reason: the true nature of an agreement controls. *Fleishman v. Hyman*, 2004 U.S. Dist. LEXIS 19793, at *20 (S.D.N.Y. 2004) ("[W]hen a transaction is challenged as usurious … [it] must be considered in its totality and judged by its real character, rather than by the name, color, or form which the parties have seen fit to give it.") (citation and internal quotations omitted); *Aaron v. Mattikow*, 146 F. Supp. 2d 263, 266 (E.D.N.Y. 2001) ("When a transaction is truly an illegal, usurious loan, there is obviously a motivation to disguise it to look like a legal non-usurious transaction; and the fact that the transaction is in form legal and non-usurious will not prevent courts from examining the transaction to see whether the true nature of the transaction is not what its form indicates."); *Bouffard v. Befese, LLC*, 111 A.D.3d 866, 869–70, 976 N.Y.S.2d 510, 511, 514 (2d Dep't 2013) ("In determining whether a transaction is usurious, the law looks not to its form, but its substance, or real character" and being a "hard money lender" to those "unable to obtain conventional financing" is nothing more than "plainly usurious" lending) (citations and internal quotations omitted); RICHARD A. GREENBERG, 6 NEW YORK CRIMINAL LAW § 19:14 (3d ed. 2014) ("[L]oansharks are more likely to discuss payment schedules than interest rates ....").

Usury renders an agreement void and cancels the borrower's obligation to repay principal and interest.  As a matter of public policy -- whether asserted as a defense or claim -- usury generally results in a net gain to the usury victim. *Bristol Inv. Fund, Inc. v. Carnegie Int'l Corp.,* 310 F. Supp. 2d 556, 562 (S.D.N.Y 2003) ("When a court deems a transaction to be usurious, it must declare the transaction and its supporting documents void, enjoin prosecution on them and order that all documents and collateral be canceled and surrendered.") (quoting *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48, 490 N.E.2d 517, 521, 499 N.Y.S.2d 650,

654 (1986)); *Bouffard v. Befese, LLC*, 111 A.D.3d 866, 870, 976 N.Y.S.2d 510, 514 (2d Dep't 2013) ("A usurious contract is void and relieves the plaintiff of the obligation to repay principal and interest thereon.") (citation and internal quotations omitted); *Abir v. Malky, Inc.*, 59 A.D.3d 646, 649, 873 N.Y.S.2d 350, 354 (2d Dep't 2009) (same); *but see Brodie v. Schmutz (In re Venture Mort. Fund, L.P.)*, 282 F.3d 185, 189 (2d. Cir. 2002) (questioning whether under New York law a criminally usurious agreement is cancelled entirely and the borrower relieved of repayment, or whether interest imposed should be reformed to a non-usurious rate, plus stating that the court's "flagg[ing]" the question "reflects no implicit resolution of it"); *Professional Merch. Advance Capital, LLC v. C Care Servs., LLC*, 2015 U.S. Dist. LEXIS 92035, at *14 n.4 (S.DN.Y. July 15, 2015) ("If the Court were to find that the Agreement contravened New York's criminal usury law, the Court would nevertheless not void the Agreement *ab initio*, but would rather revise the interest obligation to require a non-usurious rate.") (citations omitted); *Carlone v. Lion & The Bull Films, Inc.*, 861 F. Supp. 2d 312, 321 (S.D.N.Y. 2012) ("It is an open question under New York law whether a criminally usurious loan is void *ab initio* or whether a successful defense based on criminal usury results merely in the cancellation of the interest obligation or in a revised obligation to pay a non-usurious rate.").  A guaranty or security agreement accompanying a usurious loan is void under prevailing case authority.  *Oliveto Holdings, Inc. v. Rattenni*, 110 A.D.3d 969, 972, 973 N.Y.S.2d 321, 324 (2d Dep't 2013) ("Since the loan was usurious, the loan transaction ... [is] void, the plaintiff is precluded from recovering the unpaid principal of $150,000 and all outstanding interest, and all the documents and collateral must be cancelled and surrendered.") (citations omitted); *Fareri v. Rain's Int'l, Ltd*., 187 A.D.2d 481, 482, 589 N.Y.S.2d 579, 580 (2d Dep't 1992) ("[W]hen a court deems a transaction to be usurious, it must declare the transaction and its supporting documents void, enjoining prosecution on them and order that all documents and

collateral be canceled and surrendered.") (citation and internal quotations omitted).  Although the movants, who try to acquire gains of approximately 49% over about two to six months (equating to 98%–294% annually), intimate Epazz and Shaun Passley are morally culpable because, so it is said, they received money but did not repay it, New York State and Congress through Penal Law § 190.40 and RICO have imposed the opposite mandate—public policy commands that a *usurer* is the wrongdoer, not the person who has allegedly received money.

Intent within the meaning of criminal usury typically involves fact determinations.  *See Qualis Care, L.P. v. Everglades Reg'l Med. Ctr., Inc.*, 232 A.D.2d 323, 324, 648 N.Y.S.2d 580 (1st Dep't 1996) (denying summary judgment to purported accounts receivable purchaser because "questions of fact as to whether the … agreement to 'purchase' … accounts receivable was in fact a loan, disguised as a purchase, and whether that loan was usurious, [were] raised by the documentary evidence that [the merchant] always treated the transaction as a loan, plaintiff's own carefully worded and terse complaint seeking recovery of 'advances', the absence of any affidavits from the ['purchaser'] … and the affidavit of a certified public accountant who calculated the interest charged on the money 'advances' … [as] exceeding an annualized rate of 25% ...."); *Alpha Capital Anstalt v. bioMetrix Inc.*, 2010 N.Y. Misc. LEXIS 1265, at *11 (Sup. Ct. Suffolk Co. Jan. 6, 2010) ("Where usury does not appear on the face of the note, usury is a question of fact and if there are factual issues regarding usurious intent, summary judgment must be denied.") (citation omitted).  Usury does not require showing a lender knew of a certain penal law provision and specifically intended to violate it.  All penal law requires is intent to acquire a return exceeding 25%—knowledge of usury statutes is irrelevant.  *Brodie v. Schmutz (In re Venture Mort. Fund, L.P.)*, 282 F.3d 185, 188 (2d Cir. 2002) ("The application of New York's usury statutes does not depend upon a finding of intent … [because] [a] loan is usurious if the lender intends to take and

receive a rate of interest in excess of that allowed by law even though the lender has no specific intent to violate the usury laws.").

## II.     **Overcharge of Interest and Usury are Affirmative Claims**

So the movants assert (memo p. 17), usury is exclusively a defense.  They are wrong—and this is just one of the legal points they are wrong about, in addition to incorrect "facts" discussed above.  New York Civil Practice Law and Rules ("CPLR") Article 2 sets forth statutes of limitations applicable to affirmative causes of action.  CPLR § 201 ("An **action** ... must be commenced within the time specified in this article ....") (emphasis added).  An action, of course, avers claims, not defenses—and overcharge of interest *is* an affirmative claim because CPLR Article 2 ascribes a statute of limitations to it.  CPLR § 215 states:

> The following **actions** shall be commenced within one year:
>
> *   *   *
>
> (6) An **action** to recover any **overcharge of interest** or to enforce a
> penalty for such overcharge.

(Emphasis added).

A usury claim falls within the meaning of overcharge of interest.  *Garcia v. Valdes (In re Garcia)*, 167 B.R. 341, 346–47 (Bankr. E.D.N.Y. 1994) (usury claim was properly commenced within CPLR 215(6)'s one-year limitations period); *Englishtown Sportswear, Ltd. v. Marine Midland Bank*, 97 A.D.2d 498, 498, 467 N.Y.S.2d 693, 693 (2d Dep't 1983) ("[T]he one year Statute of Limitations governing actions to recover on 'overcharge of interest' was intended to apply … to usury actions.") (citations omitted).

Here, counterclaims were filed within the one-year period because, as the dismissal memorandum (p. 3) acknowledges, the merchant agreements were entered into between December 2, 2015 and January 28, 2016.  Cases cited by the movants merely show that usury is a defense

too—available when a one year limitations period applicable to an affirmative claim has expired. *Rebeil Consulting Corp. v. Levine*, 208 A.D.2d 819, 820, 617 N.Y.S.2d 830, 831 (2d Dep't 1994) ("Although [an] action to recover any overcharge of interest … is subject to a one-year Statute of Limitations, affirmative defenses, such as usury … are not subject to the Statute of Limitations.") (citations and internal quotations omitted).  Being wrong about overcharge of interest and usury being affirmative claims is another reason the dismissal motion lacks credibility because it so strongly states facts and law which are inaccurate.[6]

Nor do cases upon which the movants rely indicate whether a merchant had even tried to assert an affirmative common-law usury claim—highlighting too that, in practice, merchant agreements target small businesses already financially vulnerable, and to whom bank lending, and legal representation, is not necessarily available.  Cases ruling against a merchant who could not meaningfully litigate for want of necessary legal representation is a stand-alone reason why unpublished cases relied upon by the movants are inapplicable, but opinions from jurists who have invoked a usury analysis (sometimes *sua sponte*) are on point.

### III.   Taking or Receiving Gains Exceeding 25% is Usurious—Hypothetical Alternatives are Irrelevant

Although the dismissal memorandum (p. 2) asserts, "even if the agreements could be deemed to be loans … under applicable law, the usury claim would fail because the repayment dates were necessarily uncertain due to the condition imposed [*i.e.*, account reconciliation] and, as such, there was no deadline by which repayment was due," that assertion is another example of the movants being wrong on the law.  Penal Law § 190.40 states:

> A person is guilty of criminal usury in the second degree when, not
> being authorized or permitted by law to do so, he knowingly

---

[6] Because whether crime has occurred affects damages (*e.g.*, whether punitive damages should be awarded), Epazz and Shaun Passley out of an abundance of caution have averred usury and overcharge of interest as separate counterclaims.  (An overcharge of interest is not necessarily usurious.)

> charges, **takes or receives** any money or other property as interest on the loan or forebearance[7] of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

(Emphasis added.)

Because taking or receiving gains exceeding 25% per annum as interest triggers usury, the fact controlling whether usury has occurred is not a hypothetical return, but *actual* gain to a lender. A right to elect a lower interest rate, *e.g.*, through account reconciliation or otherwise, is irrelevant to usury because what the lender "takes or receives" controls.  Consent to usury, or a borrower otherwise electing usury upon itself, is not a defense.  *See Hornblower & Weeks, Inc. v. Blue Marlin Breweries, Inc.*, 2000 U.S. Dist. LEXIS 13748, at *21 (S.D.N.Y 2000) ("Usury laws are for the benefit of the borrower … [and] [a]s a result, a lender cannot avoid the consequences of a usurious loan merely because the borrower prompted the loan or set the applicable rate of interest.").  Penal law prohibits acquiring gains exceeding 25% per annum to a lender even if, as the movants asserts, the borrower could elect other possibilities.  *Simsbury Fund, Inc. v. New St. Louis Associates*, 204 A.D.2d 182, 182, 611 N.Y.S.2d 557, 558 (1st Dep't 1994) ("[T]he possibility of a nonusurious rate of interest … do[es] not make the subject agreements nonusurious.") (citation omitted).  Likewise, insofar as the movants may assert that Epazz repaid some, but not all money owed, and the movants thus did not receive in-hand interest exceeding 25%, that too, of course, would not defeat usury because a lender that "charges" interest exceeding 25% per annum runs afoul of Penal Law § 190.40 as well.  *American Acceptance Corp. v.*

---

[7] Forbearance within the meaning of a usury statute means additional time given to an obligor to perform after an obligation has already become due and payable. *Matias v. Arango*, 289 A.D.2d 459, 460, 735 N.Y.S.2d 157, 158 (2d Dep't 2001) (explaining that within the context of usury, "'forbearance' means to give a party additional time to perform after an obligation becomes due and payable" and that "'[a] forbearance given in consideration of the payment of more than the legal rate of interest is usurious") (citations omitted).

*Schoenthaler*, 391 F.2d 64, 74 (5th Cir. 1968) ("Clearly, the ordinary meaning of 'charge' is not sufficiently broad to contemplate the requirement of actual payment.").

Here, the counterclaims (¶¶ 38, 42–48) aver that TVT Capital required per-business day Specific Daily Amount repayments to be made within two to six months.  Usury focuses on what is actually taken or received by a lender.  A borrower not requesting account reconciliation, or forfeiture of that right for not providing any month's bank statements or otherwise, each results in taking and receiving interest exceeding 25%—and that is usury.

## IV.   Isolated Disclaimers Renouncing Loans are Ineffective Because They Contradict the Loan Application, TVT Capital's Loan Representations, and the Totality of an Agreement's Text

Merchant agreement provisions that the dismissal memorandum (p. 4) principally relies upon through block quotes are cited too in the counterclaims.  Counterclaims ¶¶ 39, 49.  The difference is that Colonial Funding and TVT Capital urge that those limited provisions override everything else in a merchant agreement, and in preceding loan representations, while Epazz and Shaun Passley urge the approach New York law provides for because they focus on the entire agreement, and the loan-only representations made.  Usually, were one to sell future accounts receivable, the prospective purchaser would, at least once, say such a sale is what it wishes to participate in, rather than exclusively representing it wants to make a loan and providing a Loan Application.

The first ink on paper, which the movants would have control the entire action, and is the lynchpin of the movants' no-loan position, appears at a merchant agreement's first page (it is not a numbered section):

> Merchant hereby sells, assigns and transfers to Funder ... in consideration of the funds provided ("Purchase Price") specified below, all of Merchant's future receipts, accounts, contract rights

and other obligations arising from or relating to the payment of monies from Merchant's customers and/or other third party payors (collectively the "<u>Receipts</u>" … ) until such time as the "<u>Receipts Purchased Amount</u>" has been delivered by Merchant to FUNDER. The Receipts Purchased Amount shall be paid to FUNDER by the Merchant irrevocably authorizing only one depositing account acceptable to FUNDER (the "<u>Account</u>") to remit the percentage specified below (the "<u>Specified Percentage</u>") of the Merchant's Receipts until such time as FUNDER receives payment in full of the Receipts Purchased Amount. In consideration of servicing the account, the Merchant hereby authorizes FUNDER to ACH Debit the "Specified Daily Amount"[8] from the merchant's bank account as the base payment credited against the Specified Percentage due. It is the Merchant's responsibility to provide bank statements for any and all bank accounts held by the Merchant to reconcile the daily payments made against the Specified Percentage permitting FUNDER to debit or credit the difference to the merchant so that payment equals the Specified Percentage.  Failure to provide all of their bank statements in a timely manner or missing a month shall forfeit all rights to future reconciliation.

Not only is the dismissal motion tainted by incorrect facts and law, the movants' agreement quotations are lacking.  The dismissal memorandum's purported quotation of the above provision (p. 4), for example, omits the above final sentence—the very words imposing account reconciliation forfeiture in the event a merchant misses any month of providing bank statements no one ever advises a merchant it is required to do in the first instance (much less for "any and all bank accounts"), and which forfeiture a merchant agreement could state in large, bold, or underlined font but does not, and that the counterclaims aver is intentional in order to negate account reconciliation and acquire certain gains exceeding 25% per annum.  The effect of doing the utmost to cause forfeiture of a purported paramount no-loan savings clause is just one of the things New York law requires consideration of as part of a usury inquiry.  Vague material change reporting requirements, of which a merchant may run afoul of based on what TVT Capital subjectively deems material, also functions as a fail-safe because in the event a merchant does

---

[8] So in original; TVT Capital likely meant "Specific" (not "Specified") Daily Amount.

provide bank statements when account reconciliation is not needed, and invokes account reconciliation when business sours, TVT Capital may claim (and in practice does claim) failure to report a material change, in order to declare an Event of Default and all sums immediately due. Counterclaims ¶¶ 64–65. Although the dismissal memorandum (p. 14) asserts (without support) that material-change reporting requirements are commonplace, generally, a party's failing once to adhere to it is not a material breach, whereas TVT Capital uses a material change clause offensively to declare a material default in order to negate account reconciliation and acquire certain cash repayments of approximately 49% in about two to six months. Counterclaims ¶¶ 58–61. Moreover, TVT Capital has already examined a merchant's books and records and knows a merchant would not need account reconciliation during the short life of an agreement, or that it could (and does) invoke the above fail-safe or other agreement provisions in the event underwriting is wrong. Counterclaims ¶¶ 55–62. This much has been admitted by a separate merchant agreement company in the parallel litigation, and Epazz and Shaun Passley aver TVT Capital employs the same practice.[9]

The other block quote in the dismissal memorandum (p. 5, quoting agreement § 1.9) too omits important language:

> Merchant and FUNDER agree that the Purchase Price under this Agreement is in exchange for the Purchased Amount and that such Purchase Price is not intended to be nor shall it be construed as a loan from FUNDER to Merchant. Merchant agrees that the Purchase Price is in exchange for the sale of future Receipts pursuant to this Agreement [and] equals the fair market value of such Receipts. *FUNDER has purchased and shall own all the Receipts described in this Agreement up to the full Purchased Amount as the Receipts are created*. Payments made to FUNDER in respect of the full amount of the Receipts shall be conditioned upon Merchant's

---

[9] Passley Dec. Ex. D at 30:05–30:14 (attorney for purported purchaser of accounts receivable stating in open court that, "[Shaun Passley] sought revenue based [financing] and was showing gross revenue of over a quarter of a million dollars [of] business per month where there is no way that he would have been eligible for, *or my clients would have never underwritten a deal like this*.") (emphasis added).

18

> sale of products and services and the payment therefore by
> Merchant's customers in the manner provided in Section 1.1.
> (Emphasis added.)

The portion of the dismissal memorandum (p. 5) citing the above provision omits the terms

(towards the middle of the provision) "FUNDER has purchased and shall own" a merchant's

accounts receivable.  The balance of a merchant agreement, and the parties' conduct in practice,

shows the "purchased and shall own" language (which the movants omit) is discredited by, among

other things averred, that TVT Capital does *not* collect the receivables despite having purportedly

purchasing and owning them.  Instead, Epazz, which according to the agreement has fully divested

itself of the receivables because it has sold them absolutely, collects those "sold" receivables and

transfers collections to TVT Capital—just as a borrower does under asset-based lending.

The dismissal memorandum block quote (p. 5) also omits § 1.9's final sentences, consisting

of the following disclaimers:

> In no event shall the aggregate of all amounts be deemed as interest
> hereunder and charged or collected hereunder exceed the highest
> rate permissible at law. In the event that a court determines that
> FUNDER has charged or received interest hereunder in excess of
> the highest applicable rate the rate in effect hereunder shall
> automatically be reduced to the maximum rate permitted by
> applicable law and FUNDER shall promptly refund to Merchant any
> interest received by FUNDER in excess of the maximum lawful rate
> it being intended that Merchant not pay or contract to pay and that
> FUNDER not receive or contract to receive directly or indirectly in
> any manner whatsoever, interest in excess of that which may be paid
> by Merchant under applicable law.

Because an agreement's true nature controls, the above disclaimers are legally

meaningless—except to expose that TVT Capital intends to commit usury, but tries to get away

with it if caught through the above provision. *Aaron v. Mattikow*, 146 F. Supp. 2d 263, 267

(E.D.N.Y. 2001) ("The … presence of a waiver of defense language … is not dispositive as to a

defense of usury [because] [i]f it were, a lender could readily insulate himself from a claim

19

of usury by simply asserting appropriate language in the [agreement] … [and] [a] waiver clause … does not constitute a waiver, nor does it estop an obligor from asserting usury as a defense ….”); *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*, 128 A.D.3d 1007, 1008, 9 N.Y.S.3d 682, 683 (2d Dep’t 2015) (“[A] clause … purporting to reduce the rate of interest to a non-usurious rate if the rate originally imposed was found to be usurious [did] not save the note from being usurious.”) (citation omitted); *Simsbury Fund, Inc. v. New St. Louis Associates*, 204 A.D.2d 182, 182, 611 N.Y.S.2d 557, 558 (1st Dep’t 1994) (“[L]anguage … purporting to reduce the interest rate to the legal rate in the event of a finding of usury, do[es] not make the subject agreements nonusurious.”) (citation omitted).  Now that the merchant agreement provisions that are the lynchpin of the dismissal memorandum have been addressed, review of everything else in the agreement is appropriate to place the isolated provisions upon which the movants rely in proper context, and segue into further applicable law.

## V.      Ubiquitous Loan Language Used Elsewhere in the Agreement is Consistent With the Loan Application and Loan Representations

Although account reconciliation, according to TVT Capital, hypothetically makes a merchant agreement’s term, and thus rate of gain to TVT Capital, uncertain or indefinite, which would not defeat usury in any event because as discussed above actual gain charged, taken, or received controls, subsequent sections of TVT Capital’s merchant agreement each independently negates account reconciliation hypotheticals.  The agreement states, in bold, capital letters following the account reconciliation clause:

> **THE TERMS, DEFINITIONS, CONDITIONS AND INFORMATION SET FORTH ON PAGE 2 … HEREOF ARE HEREBY INCORPORATED IN AND MADE A PART OF THIS AGREEMENT.**

Passley Dec. Ex. B p. 1.

20

The agreement, to eliminate a possibility of non-payment being permitted, states (among other provisions discussed below):

> ### II. REPRESENTATIONS, WARRANTIES AND COVENANTS.
> Merchant represents, warrants and covenants that as of this date *and during the term of this Agreement*.
>
> ### 2.1 Financial Condition and Financial Information. Its bank and
> financial statements, copies of which have been furnished to
> FUNDER, and future statements which will be furnished hereafter *at
> the discretion of FUNDER*, fairly represent the financial condition of
> Merchant at such dates, *and since those dates there has been no
> material ... changes* financial or otherwise, in such condition,
> operation or ownership of Merchant.  *Merchant has a continuing
> affirmative obligation to advise FUNDER of any material ... change
> in its financial condition, operation or ownership ….*

Passley Dec. Ex. B p. 3 (emphasis added in italics).

This paragraph undercuts the movant's position for independent reasons.  *First*, it tells a merchant that bank statements need only be provided at TVT Capital's discretion—and a merchant's adhering to that charge by not providing bank statements until TVT Capital asks steps directly into account reconciliation forfeiture for failure to provide "any and all bank statements" in a "timely manner," or "missing a month."

*Second*, TVT Capital when entering into a merchant agreement has already examined as part of its underwriting a borrower's existing receivables and sales.  Counterclaims ¶ 55.  TVT Capital did the above examination prior to entering into its merchant agreement with Epazz. Counterclaims ¶ 56.  Based on the above examination TVT Capital concludes a borrower's accounts receivable would permit it to repay the principal amount owed, plus an approximately 49% gain, within a two to six month period.  Counterclaims ¶ 57.  Not only does this mean in practice that TVT Capital does not extend funds to a business it believes potentially could request account reconciliation, it gives TVT Capital an out in the event its underwriting is wrong.  A

borrower under a merchant agreement makes a continuing representation, warranty and covenant that there has been no material adverse changes to its business.  Because "material changes" is undefined, it permits TVT Capital to assert, and TVT Capital does in practice assert, that a material adverse change had occurred before a borrower so advises—and that is what TVT Capital does to divest a merchant of account reconciliation and declare an Event of Default to always be able to cancel an account reconciliation right.  Counterclaims ¶¶ 58–61.

Section 3.1 of TVT Capital's merchant agreement independently ensures that TVT Capital can acquire Specific Daily Amount payments always in order to gain an approximately 49% return in about two to six months:

> **Events of Default.**  The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant shall violate any term or covenant in this Agreement; … (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors; or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking reorganization, arrangement, adjustment, or composition of it or its debts; … (e) Merchant shall … interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; … (k) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement ….

Passley Dec. Ex. B p. 3.

A merchant whose business sours is forced to continue a losing business because closing shop or reducing the value of collateral through downsizing or otherwise each is an Event of Default.  Also an Event of Default is admitting in writing to inability to pay its debts.  Nor may a borrower cut its losses by selling assets or doing other things a distressed firm normally would do, because the decision to "interrupt, suspend, dissolve or terminate its business"; or to "transfer or sell all or substantially all of its assets"; or to "perform any act that reduces the value of any Collateral" too are independent Events of Default.

Bankruptcy too is an Event of Default—proving incorrect the movants' position that TVT Capital bears a business failure risk.  The business, and its principal who has made and delivered a personal guaranty, are the ones exclusively bearing a failure risk.  Events of Default also include things beyond a merchant's control because a third person filing an involuntary bankruptcy petition is an Event of Default.  But, so TVT Capital would have it, a merchant no matter what must continue a losing business.  Losing money, being put into bankruptcy, and a human being principal of the merchant bleeding personal assets or becoming destitute, solely so that a merchant may continue to collect receivables to pay over to TVT Capital, are the things TVT Capital requires in order to create on paper a purported contingent return.  Regardless of what ink on paper may say, operating a losing business (much less indefinitely or, according to the movants' hypotheticals, forever) solely to possibly generate receivables to pay to TVT Capital is not a realistic option for a human being.  This Court should recognize the continue-a-losing-business obligation for what it is—ensuring that TVT Capital definitely is repaid or may declare an Event of Default.  In any event, in practice, were a merchant's business to do poorly over ten years or any other time period materially affecting repayment, TVT Capital in practice does rely on (among other things) material change reporting requirements to still declare an Event of Default.

TVT Capital's merchant agreement could have permitted a losing business to file a voluntary bankruptcy petition, or go out of business, as other merchant agreement companies do. Passley Dec. Ex. E p. 3 § 4.4 (final sentence) (referring to merchant agreement parties as "Buyer" and "Seller," and stating "the fact that [Seller] goes bankrupt or out of business shall not (a) be considered a Breach, or (b) obligate Guarantor(s) to pay the Purchased Amount to Seller").  But TVT Capital, unlike others' merchant agreements, always requires repayment.  TVT Capital's individual practices also highlight that this action is *not* about declaring whether the merchant

agreement industry is improper in general, but only whether *TVT Capital's* agreements are usurious and *TVT Capital's* Loan Application and other business practices improper.

TVT Capital's intent is more apparent when one questions why the percentage gain it receives upon full repayment totals 49% or 49.9%. Interest exceeding 50% per annum matters because that interest rate invokes the Racketeer Influenced and Corrupt Organizations Act's usury proscriptions, 18 U.S.C. § 1961 *et seq.* (discussed below).[10]

## VI.   Other Merchant Agreement Terms Evidencing that TVT Capital Intentionally Made Loans

Collars determining whether an animal is a dog or cat (dismissal memo p. 16 n.7), and reliance on words such as "pay" being ordinary English appearing in all sorts of transactions (p. 16), and that those words do not make things like an insurance policy or payroll a loan, each misses the mark because a merchant agreement is the subject of this action and what "pay" or other words mean within the meaning of *that* document is determinative—not what words may mean in other contexts or industries such as insurance, an employer's payroll, or other conduct or agreements one may include the word "pay" in but have nothing to do with a merchant agreement's context or terms. Words as used in this merchant agreement affecting the alternatives of a loan or Epazz having sold its future accounts receivable are discussed below.

---

[10] Among other things, because commissions, origination fees, and similar charges count towards usury, under each of its merchant agreements TVT Capital in fact does acquire interest exceeding 50% during the repayment period.

- *Factoring is Making a Loan*

Each merchant agreement refers to itself as a "Factoring" Agreement. Passley Dec. Ex. B p. 1. Because factoring refers generally to loans made against a company's accounts receivable,[11] factoring weighs towards a loan. That result is all the more forceful because making payments through receivables (archetypical factoring) is precisely what Epazz was required to do.

- *TVT Capital Does Not Collect Receivables that Epazz Has Purportedly Sold and That TVT Capital Purportedly Owns Absolutely*

Conduct too determines which direction the scale tips concerning a loan being made or Epazz having sold its future accounts receivable. It is easy for TVT Capital to print in certain places "sale" and like words on its merchant agreement. Blinders-on reading, however, is not what New York law requires. TVT Capital purports to be the "absolute owner" of the receivables, Passley Dec. Ex. B p. 1 (first full para. second line); and that it "has purchased and shall own all" the receivables, Passley Dec. Ex. B p. 3 § 1.9. Were that true, Epazz, of course, would no longer have rights with respect to "sold" receivables. Yet, Epazz is the one who collects the very receivables it no longer has rights with respect to—and that is inconsistent with TVT Capital being "absolute owner" of the receivables "purchased." All parties thus act inconsistent with a sale, but fit easily within the framework of a loan payable form receivables collection.

---

[11] *Shanghai Weiyi Int'l Trade Co., Ltd. v. Focus 2000 Corp.*, 2015 U.S. Dist. LEXIS 141808, at *6 (S.D.N.Y. Oct. 16, 2015) ("[Under] standard factoring agreements ... [the factor] lends money to [borrowers], which in turn 'sell and assign' their accounts receivable to [the factor and that factor] ... retains a security interest in all of [the borrower's] existing and after-acquired accounts receivable ... [and the factor] perfect[s] its security interest in that collateral by filing UCC financial statements ...."); *Midlantic Commer. Co. v. Prime Sportswear Corp.*, 1999 U.S. Dist. LEXIS 13238, at *2 (S.D.N.Y. Aug. 25, 1999) ("[A] commercial lender ... entered into a factoring agreement ... [p]ursuant to [which the factor] loaned money to [a manufacturer] and [the manufacturer] assigned all its accounts receivable [to the factor] ... [and] [t]o further secure its loans ... [the factor] took a security interest in, inter alia, [the manufacturer's] accounts, and the proceeds thereof."); *Le Chase Data/Telecom Servs., LLC v. Goebert*, 6 N.Y.3d 281, 284, 844 N.E.2d 771, 772, 811 N.Y.S.2d 317, 318 (2006) ("[A] factor [is] a company that lends money to others on the security of their accounts receivable."); *Hamilton Capital VII, LLC v. Khorrami, LLP*, 2015 N.Y. Misc. LEXIS 2954, at *1–2 (Sup Ct. NY Co. Aug. 17, 2015) (lender "essentially functions as a factor; that is, it lends money ... and the loans are secured by the [borrower's] accounts receivable").

- *TVT Capital Does Not Investigate Underlying Obligors*

A true accounts receivable purchaser would want information about specific receivables purchased and the underlying obligors, to vet what it may purchase.  Here, despite all the other rights TVT Capital vests itself with, nowhere does TVT Capital grant itself a right to approve a sale or otherwise vet or affect what it purportedly acquires.  Reason: TVT Capital does not truly view Epazz as selling future accounts receivable.

- *A Security Agreement Accompanies Each Merchant Agreement*

Were a merchant agreement truly a sale, *i.e.*, a title transfer upon TVT Capital paying the purchase price, TVT Capital would gain title to future receivables, the transaction would be concluded, and there would be no need for a security agreement for want of a future obligation to secure.  TVT Capital would move forward from the concluded transaction independent of Epazz by, among other things, collecting receivables from account debtors.

The remedy for failure to convey title, of course, would be specific performance.  TVT Capital does not seek specific performance to compel a title transfer but, rather, seeks a sum of money, just as a lender does upon a loan-payment default.  Nowhere does TVT Capital assert that money sought is liquidated damages, or that the agreement contains a liquidated damages clause.

The security agreements too refer to the agreement as a "Factoring Agreement."  Passley Dec. Ex. B p. 4 (first full para., second line).  Also in the security agreements are cross-collateralization provisions for the protection of "the Funders" and "participants."  Passley Dec. Ex. B p. 4 (second full para).  Each of those terms refer easily to a loan.  Fund, in contrast, is not ordinary English for selling an asset.

The security agreements also address obligations owed by "acceleration or otherwise."  Passley Dec. Ex. B p. 4 (security agreement's final para).  Because a future receivable exists only

26

in the future, any obligation concerning them cannot be accelerated; but acceleration is archetypical loan language.

- *A Guaranty Accompanies Each Merchant Agreement*

So the dismissal memorandum says (p. 14), a "merchant does not default if it simply misses a payment (or payments) because its collections are slow." That is wrong. The allegedly variable thing under a merchant agreement is not that a payment may be missed. Instead, only end-of-month account reconciliation may occur. A merchant must always pay the fixed per-business day Specific Daily Amount (whether or not it has the resources to do so); and at month's end, it is alleged, a credit is given to the merchant to the extent the grand total of per-business day payments exceed the specified percent of a merchant's receivables. A merchant must always make base per-business day payments even if its receivables collections are zero. Not doing so is an Event of Default.

So it is also said (p. 14), a merchant "defaults only by taking other deliberate acts inconsistent with performance of its obligations under the Agreement." The dismissal memorandum continues (p. 15), "the guarantee on its face is one of *performance*, not of payment." The guarantee of performance versus payment distinction *undercuts* TVT Capital's position. The performance a loan requires is the payment of money. Performance under a merchant agreement, it is said, is not the payment of money, but operating a business continually and doing other required acts. Because guaranty of performance, not payment, means that Shaun Passley only guaranteed Epazz would do acts not consisting of paying money, the guarantor may not properly be sued for money because money payment is not what was guaranteed.

The more realistic conclusion, of course, is that the merchant agreement is a loan and the guaranty is for loan repayment. Epazz and Shaun Passley being sued for money either is a

27

concession that paying money *is* the performance under the contract, thereby making it a loan; or that grounds for dismissing TVT Capital's underlying complaint exist because were these truly performance-only contracts, only specific performance may be properly sued for, but specific performance is not sought.  Nor does TVT Capital assert the contract contains a liquidated damages provision or any other mechanism to substitute money for failure to perform an act.  In any event, because of the approximately 49% gain immediately due (equating to 98%–294% annually), such amount would be a penalty.  *Fifty States Management Corp. v. Pioneer Auto Parks, Inc.*, 46 N.Y.2d 573, 576–77, 389 N.E.2d 113, 115–16, 415 N.Y.S.2d 800, 802 (1979) ("[E]quity will often intervene to prevent a substantial forfeiture occasioned by a trivial or technical breach ... [and, because] equity abhors forfeitures[,] ... courts will examine the sum reserved under an instrument as liquidated damages to insure that it is not disproportionate to the damages actually arising from the breach or designed to coerce the performance of a party.") (citations omitted).

Moreover, upon breach by Epazz of the purported promise to perform only acts, TVT Capital may look to the guarantor for recovery without first seeking to "obtain payment from Merchant."  Passley Dec. Ex. B p. 4 (guaranty's second full para., second line).  That clause further points to a money payment obligation because "payment" is what the guarantor must reportedly perform upon default.  A performance guaranty, of course, would not involve payment from the guarantor because performance would be the only thing guaranteed.  The language allowing TVT Capital to sue Shaun Passley for money without first suing Epazz more properly reflects guaranty of the promise to pay money—and that points to a loan.

Additionally, a guaranty's terms refer to the prospect that a merchant may do a "sale or other disposition of any collateral securing the Guaranteed Obligations."  Passley Dec. Ex. B p. 4 (guaranty's third full para., first subsection "iii").  Had TVT Capital actually purchased accounts

receivable, there would be no need to address those assets' sale because title to those assets would have already vested in TVT Capital.  In addition, a guaranty applies, in its words, to "Merchant's failure to pay timely any amount owed under the Merchant Agreement."  Passley Dec. Ex. B p. 4 (guaranty's third para., second line); and refers in that paragraph to "payment under this Agreement" by the merchant (eighth line), the merchant's obligations having to be "paid in full" (tenth line), and to "amounts paid" or an "amount paid" by the merchant or guarantor (tenth, twelfth, and thirteenth lines)—each of which payment references may reasonably refer to a loan only.  "Transfers" or other acts that are not the payment of money could have been stated, but were not.

The guaranties too refers to the lender's rights to "renew, extend, or otherwise modify the Merchant cash advance agreement."  Passley Dec. Ex. B p. 3 (guaranty's third full para., second subsection "i").  A sale, of course, would be a one-time event, inconsistent with renewing, extending, or modifying.

- *Other Words, Terms, and Conduct Supporting a Loan*

The agreements, further evidencing a loan only, discuss at length repayment terms and conditions.  Passley Dec. Ex. B p. 3 § 1.11.  But repayment of the purchase price is not a sale.

TVT Capital also grants to itself the right to investigate a merchant's "financial responsibility and history."  Passley Dec. Ex. B p. 3 § 1.4.  Were a merchant agreement truly an accounts receivable purchase, TVT Capital would be concerned with an underlying account debtor's financial responsibility and history, because that entity would be the source of payment. Nowhere does a merchant agreement concern an account debtor.

The merchant agreements underscore the importance to TVT Capital of the merchant's "credit standing" and "business conduct," and attempts to vest with TVT Capital the right to report

29

upon such things to credit reporting bureaus.  Passley Dec. Ex. B p. 3 § 1.12.  Were a merchant agreement truly an accounts receivable sale, the underlying account debtor's credit standing and business conduct would be important.

A merchant agreement refers to TVT Capital as "FUNDER."  Passley Dec. Ex. B p. 1 (top of document).  A funder in ordinary English is a person who provides money or other pecuniary resources for investment or future gain.  It does not refer to a buyer or a sale.  The agreements could have referred to TVT Capital as the "BUYER", which is an ordinary English sale term, but it does not.

The agreement referring to TVT Capital as the "lead purchaser" for itself and "co-investors" further indicates that this is a loan facility because there typically are not multiple purchasers or investors to an accounts receivable sale, but participation loans or syndicated loans, in which multiple lenders take a share of a non-payment risk, are common.  Passley Dec. Ex. B p. 1 (first full para., line 1).  Indeed, the agreement reiterates elsewhere that TVT Capital is the "administrator and lead investor for a group of independent participants."  Passley Dec. Ex. B § 4.2 (stating the foregoing); § 4.5 (again referring to "Participants" in the transaction).

TVT Capital states that a "Merchant shall not enter into any arrangement, agreement or commitment for any additional financing, whether in the form of a purchase of receivables or a loan to the business with any party other than FUNDER …."  Passley Dec. Ex. B § 2.10.  This further shows that TVT Capital is a financier, not that Epazz had sold future accounts receivable to TVT Capital.

TVT Capital's complaint in this action further shows a loan because, among other things, it describes this action as one for a "debt owed" (complaint ¶ 21), rather than one for specific performance of acts other than the payment of money.  TVT Capital's complaint also states that it

30

seeks to collect a "balance due" for which it issued "Statements of Account" (complaint ¶¶ 31–33); and that the guaranty concerns a merchant's "payment" obligations (complaint ¶¶ 36, 39), each of which too is inconsistent with ordinary English that would refer to specific performance of a sale.

Nor may it be credited that the "Purchase Price" is the "fair market value" of a merchant's accounts receivable, as TVT Capital claims, Passley Dec. Ex. B p. 3 § 1.9, because the "Receipts Purchased Amount" is about 49% greater than the future receivables purchased and those future receivables do not even exist at the time of purchase.  Under New York law, ink on paper saying Epazz stipulated to that valuation is not controlling.  The totality of an agreement determines its true nature.

### VII.   <u>Decisions From This Court and Others Support the Counterclaims</u>

Those targeted by merchant agreements, case law shows, often are businesses without legal representation to meaningfully challenge in litigation an entity such as TVT Capital.  To the counterclaim plaintiffs' knowledge, this Court has considered a merchant agreement twice—and each time at an inquest or unopposed motion.

Upon an Event of Default, so a merchant agreement states, 100% of not-presently-existing, future receivables must be immediately paid to the Funder.  The logical gap of a non-existent thing being required to be transferred immediately was highlighted by Magistrate Judge Freeman in *Merchant Cash & Capital LLC v. Edgewood Group., LLC*, 2015 U.S. Dist. LEXIS 94162 (S.D.N.Y. July 2, 2015).  There, as Colonial Funding asserts here, a merchant purportedly sold its future accounts receivable in exchange for a lump sum to be repaid to the funder, plus an approximately 50% per annum gain.  No party raised a usury claim or defense, or presented to the Court a Loan Application or written loan representations, or anything else, because the merchant

31

had defaulted.   *Id.* at *2 ("[N]either defendant has appeared in this action or otherwise communicated with this Court.").   Yet, the merchant agreement, Magistrate Judge Freeman concluded, appeared to be a loan—the conclusion Epazz and Shaun Passley reached, except that they were ushered to that conclusion by the Loan Application and loan representations and, unlike Magistrate Judge Freeman, are laypersons and not judges.  Magistrate Judge Freeman stated:

> Although the Merchant Agreement explicitly states that the transaction at issue is not a loan (*see* Merchant Agreement § 4.1 (stating that the transaction "is not intended to be, nor shall it be construed as, a loan"); *id.* § 5.11 (stating that Edgewood and [William] Crocker [*i.e.*, the merchant and its principal] agree not to institute or prosecute any claim of usury, and that, in the event of a breach of this provision, they will be liable for Plaintiff's costs, including attorneys' fees)), the structure of the transaction suggests otherwise.  While the Merchant Agreement apparently contemplates the purchase of a percentage of future credit card receivables, no percentage is specified. Instead, Edgewood Group bound itself, through the ACH Agreement, to making regular payments over the course of about eight months, until it paid the amount it had received up front, plus 42 percent more.  This arrangement looks substantially like a loan (as opposed to Plaintiff's acquisition of a portion of Edgewood's future receivables), but with an effective interest rate of over 50 percent per year.

> \* \* \*

> [The] allegations again appear to contemplate a loan-like transaction, as it is unclear how a company's "future receivables" -- which do not presently exist -- could become "immediately due."  As noted above, however …, this question involves factual issues not presently before the Court [because the merchant had defaulted].

*Id.* at *10–11 n.5, *26 n.7.

Magistrate Judge Freeman's loan query was spot-on and, at the very least, supports Epazz and Shaun Passley's belief that they had entered into a loan.  Here, TVT Capital did state a Specified Percentage; and its agreements also state the forfeiture term and other contract provisions discussed above and, in practice, TVT Capital denies account reconciliation, and otherwise

requires fixed payments as discussed above.  In any event, the actual sum charged, taken, or received controls.

Judge Sullivan recently raised similar observations.  *Professional Merch. Advance Capital, LLC v. C Care Servs., LLC*, 2015 U.S. Dist. LEXIS 92035 (S.DN.Y. July 15, 2015).  There, a merchant asserted a usury defense; but a summary judgment motion filed shortly afterwards by the plaintiff was unopposed.  *Id.* at *6–7.  Judge Sullivan, granting the motion as to liability, but reserving decision as to damages, held:

> [T]he Court reserves ruling … pending a supplemental submission from Plaintiff as to whether the Agreement -- though *nominally structured* as a sale of accounts receivable -- in fact violates New York's criminal usury law ....  Critically, in assessing a usury defense, the Court must look to the nature of the transaction and not to the form in determining whether such transaction was usurious.
>
> Here … the Agreement obligated Plaintiff to pay C Care $1,084,850 in exchange for payment of all of C Care's accounts receivable, *or a minimum of $35,000 weekly*, until the Purchased Amount of $1,317,700 was reached.  Looking beyond the form of [a] transaction and [examining] its substance, it could be argued that the Agreement, which obligates Defendants to make a minimum weekly payment *irrespective* of C Care's accounts receivable and subjects Plaintiff to no downside whatsoever aside from the risk that the borrower will fail to make the required payments, is in fact a loan.

*Id.* at *12–13 (citations and internal quotations omitted).

Judge Sullivan's analysis segues into whether an account reconciliation provision avoids usury.  For the above reasons, Epazz and Shaun Passley assert account reconciliation is illusory, and the movants assert account reconciliation is unavailable to Epazz.  Here, the Loan Application and loan representations all the more support Epazz and Shaun Passley's position.  The movants do not cite the above *C Care Servs.* order to this Court.

The unreported *C Care Servs.* order the movants do cite, as here, involved the funder relying on an account reconciliation clause in further unopposed, one-sided briefing.  The funder

33

upon asserting account reconciliation for the first time did not tell the Court whether reconciliation-negating forfeiture, a material change reporting requirement, Events of Default, and other things discussed above were at play.  That funder being unopposed, Judge Sullivan granted the lender's summary judgment motion.  *Id.* at p. 2 ("[T]he Court finds that Defendants have abandoned any argument that the contract is usurious by failing to oppose Plaintiff's motion.") (citation omitted).  In this case, Epazz and Shaun Passley, of course, have not abandoned usury, and this action differs from other reported cases because of all the opposition points raised that Judge Sullivan did not have occasion to consider.

State case law too either supports Epazz and Shaun Passley's position or cannot be properly relied upon because facts and law asserted in this action were not addressed.  In *Clever Ideas, Inc. v. 999 Restaurant Corp.*, 2007 N.Y. Misc. LEXIS 9248 (Sup. Ct. NY Co. Oct. 12, 2007) -- also not cited by the movants -- a restaurant entered into two agreements under which it received two lump sum cash advances of $22,000 and $213,000, repayable in the amounts of $44,000 and $319,000.  *Id.* at *1–2.  After the restaurant concluded the agreements were usurious, it refused continued repayments.  The purported funder sued; and the Court held:

> The transactions at issue here are clearly payable absolutely, and thus loans.  Beyond the superficial hazard associated with a New York restaurant's relatively meager chance of success, [the funder] backed up the risk with [a] personal guarantee [from the restaurant's principal] and a security interest in [the restaurant's] property.  **Moreover, any default of the Agreements (including the restaurant's closing or bankruptcy) would trigger payment.  Hence, there are no reasonable means of non-payment, and accordingly no risk of non-payment.  Consequently, the usury defense is available to defendants and will not be dismissed**.

*Id.* at *5–6 (footnote omitted) (emphasis added).

*Clever Ideas* is not an isolated decision.  New York has long punished criminal usurers who masquerade as purported accounts receivable purchasers.  In *People v. Service Inst., Inc.*, 101

Misc. 2d 549, 552, 421 N.Y.S.2d 325, 327 (Sup. Ct. Suffolk Co. 1979), in the court's words, a business (funeral home), "to alleviate its cash flow needs, 'assigned' to the defendant … accounts receivable for which it [received] an amount equal to 92% of their face value subject to further payments of 'service charges' if [the defendant] was not paid within 60 days." *Id.* at 549–50, 421 N.Y.S.2d at 326.  Such terms caused yearly interest to exceed 25%.  *Id.* at 550, 421 N.Y.S.2d at 326.  And, as in this action, "[i]n all cases the assignor guaranteed payment of all sums due on the 'assignor paper' ...." *Id.* at 551, 421 N.Y.S.2d at 326.  To escape usury laws, the funder asserted, in the court's words, "that the money it paid to the funeral home represented the price for a purchase by it of the receivables -- as distinguished from a loan -- and was therefore not a transaction subject to the usury laws." *Id.* at 550, 421 N.Y.S.2d at 326 (citations omitted).

Because the true nature of an agreement controls (not the title given to it), *id.* at 550, 421 N.Y.S.2d at 326, the criminal court upheld the indictment of the accounts receivable "purchaser":

> The entire document and the course of conduct of the parties must be examined to determine their intent.
>
> The existence of a recourse provision [against the purported "assignor"] … is a circumstance that may be considered in arriving at the true intent of the parties ….
>
> \* \* \*
>
> [A purported] unconditional transfer of title may not become effective where the assignor retains the authority to collect the receivable.
>
> \* \* \*
>
> Applying the applicable law to the facts at bar, the court concludes that the contract between the [purported purchaser] and the funeral home may be found to evidence a loan secured by the accounts receivable.  The combination of circumstances in this case [compel the above conclusion], to wit, the right of full recourse … and [defendant's] attendant failure to assume risk; [and] the charging of interest plus a service charge.

*Id.* at 551–52, 421 N.Y.S.2d at 327 (citations omitted) (citations omitted)

35

To the counterclaim plaintiffs' knowledge, there is no Second Circuit or New York Appellate Division cases concerning a merchant agreement.  Merchants in this state evidently seldom have counsel to effectively provide a defense—and unreported cases the movants rely upon reflect this because of their lack of discussing each of the contract provisions, a Loan Application, loan representations, and other averments raised in this action.

Merchant agreements differ materially from each other—underscoring strongly that an unreported case upholding a merchant agreement is not necessarily applicable to this action because TVT Capital's agreement differs from other merchant agreements.  Merchant Cash and Capital, LLC's standard form, for example (Passley Dec. Ex. E p. 3 § 4.4, final sentence) *does* permit, among other things, a merchant to file a voluntary bankruptcy petition or go out of business, without that being an Event of Default.  That, by itself, is a material distinction, and it is telling that cases the movants do cite do not discuss facts averred here.

*Transmedia Restaurant Co., Inc. v. 33 E. 61st Street Restaurant Corp.*, 184 Misc. 2d 706, 710 N.Y.S.2d 756 (Sup. Ct. NY Co. 2000), cited by the dismissal memorandum (pp. 8–9), is illustrative.  Transmedia was, among other things, a *marketing* company—it extended to a restaurant a lump sum cash payment and, in return, received after certain thresholds were met a percentage of the restaurant bill generated only by consumers it ushered to the restaurant and who paid using a Transmedia card.  *Id.* at 707, 710 N.Y.S.2d at 758.  That marketing was Transmedia's business, not loan making, and absent consumers dining at promoted restaurants Transmedia would never receive a dime.  *Id.* at 711, 710 N.Y.S.2d at 760 ("Transmedia bears the risk of not being repaid the advanced funds.").

TVT Capital, of course, generates no business to a merchant, nor does it claim to do so, making *Transmedia* inapposite.  *See Clever Ideas, Inc. v. 999 Restaurant Corp.*, 2007 N.Y. Misc.

LEXIS 9248, at *6 (Sup. Ct. NY Co. Oct. 12, 2007) ("[T]he *Transmedia* case is easily distinguishable ....").

*Strategic Funding Source, Inc. v. AR Dental Supply Corp.*, Index No. 29923/08 (Sup. Ct. Kings Co. Oct. 9, 2009), relied upon by the movants, stated the agreement there "cannot be meaningfully distinguished" from, among other things, that in *Transmedia*. Lawsuit funding cases are similarly inapposite. Needless to say, a lawsuit's outcome is contingent. A lawsuit funder bets on the outcome by advancing funds that are not repaid in the event a plaintiff loses. For its investment risk, a lawsuit funder may enjoy large returns.

Out-of-state cases too have found cash advance companies to be usurers. *Bistro Executive, Inc. v. Rewards Network, Inc.*, No. CV 04-4640 CBM, at pp. 12–23 (C.D. Cal. July 20, 2006) (applying usury analysis in the manner New York courts do to hold cash advance agreement to a restaurant was usurious). The *Bistro Executive* order is attached as Exhibit F to the Passley Dec. The defendant there, Transmedia's successor company, still was found to be a usurer despite it being a marketing company.

Reviewing a merchant agreement as a whole, and because of TVT Capital's specific agreement and practices averred, the movants' request to dismiss the usury assertions should be denied.

## VIII.   RICO Claims Were Properly Pleaded

### A.   *Incorrect Facts and Law Taint the Dismissal Memorandum's RICO Treatment*

RICO broadly proscribes two classes of conduct: (i) racketeering activity; and (ii) collection of an unlawful debt. Each of those terms is defined by the statute. 18 U.S.C. § 1961(5) ("pattern of racketeering activity"); § 1961(6) ("unlawful debt"). The counterclaims aver both collection of an unlawful debt and, alternatively, a pattern of racketeering activity consisting of

fraud—the dismissal memorandum (p. 18) statement that only unlawful debt is averred is inaccurate.  Much case law focuses on pattern of racketeering activity because that class consists of many prohibited acts, including not only mafia imagery-invoking things, such as murder, bribery, counterfeiting, and contraband cigarettes, but also typically non-violent conduct such as fraud using the mail or wires.  18 U.S.C. § 1961(1) (enumerating conduct that is racketeering activity); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 191 (1997) (fraud accounts for a "high percentage" of RICO racketeering claims).  In contrast to racketeering activity, the other general class of conduct invoking RICO, collection of an unlawful debt, applies only to illegal gambling and usury.  18 U.S.C. § 1961(6) ("unlawful debt" refers to illegal gambling or usury).

There must be a pattern of racketeering activity in order to trigger RICO liability for the "racketeering" class of wrongful conduct.  In contrast, a single collection of an unlawful debt as part of one's business invokes RICO.  *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991) ("Unlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the government need only demonstrate a single collection.") (citations omitted); *Fleishman v. Hyman*, 2004 U.S. Dist. LEXIS 19793, at *25 (S.D.N.Y. Sept. 30, 2004) ("In lieu of a pattern of racketeering activity, a plaintiff may also prove the collection of an unlawful debt.").

"Pattern" (applicable only to racketeering) is defined as two or more racketeering activities occurring within ten years of each other.  18 U.S.C. § 1961(5) (stating the foregoing ten-year time frame for two or more racketeering activities); *Klehr v. A.O. Smith Corp.*, 521 U.S. 179, 183 (1997) ("The word 'pattern' [within the meaning of RICO] is ... a term of art defined to require at least two acts of racketeering activity ... within ten years [of each other].") (citation and internal quotations omitted).  An instance of racketeering activity (*e.g.*, fraud) is known as a "predicate

act." *RJR Nabisco, Inc. v. European Community*, 136 S. Ct. 2090, 2096 (2016) ("The statute defines 'racketeering activity' to encompass dozens of state and federal offenses, *known in RICO parlance as predicates*.") (emphasis added); *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 6 (2010) ("[R]acketeering activity is defined to include a number of so-called predicate acts, including … mail and wire fraud.") (citation omitted) (alteration in original); *Beck v. Prupis*, 529 U.S. 494, 497 n.2 (2000) ("Section 1961(1) contains an exhaustive list of acts of 'racketeering,' commonly referred to as 'predicate acts' ... [including] mail fraud ... and wire fraud ....").

Common law has added the requirement that a pattern of racketeering activity not only consist of two predicate acts within ten years of each other, but that such activity must be of a continuing nature. *King v. Wang*, 2016 U.S. App. LEXIS 15753, at *3 (2d Cir. Aug. 26, 2016) ("To adequately plead a pattern of racketeering activity, a plaintiff must plead at least two predicate acts, ... must show that the predicate acts are related[,] ... [and] plaintiffs must plead the predicate acts amount to, or pose a threat of, continuing criminal activity, the so-called 'continuity' requirement.") (citations and internal quotations omitted); *United States v. Cain*, 671 F.3d 271, 284 (2d Cir. 2012) ("[T]he commission of two racketeering acts in furtherance of the RICO enterprise is not alone sufficient to establish a RICO pattern ... [r]ather, [there must be] some showing that the racketeering acts are interrelated and that there is continuity or a threat of continuity.") (citations and internal quotations omitted).  In the event the merchant agreements are found to be sales of future accounts receivables uncapped by usury proscriptions, the counterclaims aver a pattern of racketeering activity because TVT Capital and its representatives engaged in more than two loan misrepresentations concerning three separate merchant agreements to Epazz, including the Loan Application and loan-only e-mails discussed above.  The continuity requirement has been met because TVT Capital has engaged in the same fraudulent acts against

other companies since it was formed in 2008 and continues to do so as part of its ongoing business. Counterclaims ¶¶ 12, 16. Epazz and Shaun Passley were damaged, of course, because based upon fraud they entered into the merchant agreements resulting in monies allegedly owed and this litigation.

Collection of an unlawful debt is distinct from, and has nothing to do with, predicate acts, a ten-year span, or a pattern of racketeering activity—a single instance of collecting an unlawful debt as part of one's business triggers RICO liability. *United States v. Giovanelli*, 945 F.2d 479, 490 (2d Cir. 1991) ("Unlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the government need only demonstrate a single collection.") (citations omitted); *Fleishman v. Hyman*, 2004 U.S. Dist. LEXIS 19793, at *25 (S.D.N.Y. Sept. 30, 2004) ("In lieu of a pattern of racketeering activity, a plaintiff may also prove the collection of an unlawful debt."). Collection of an unlawful debt occurs less commonly because the statute defines it to include only gambling or usury. 18 U.S.C. § 1961(6) (limiting collection of an unlawful debt to gambling or usury).

Usury within the meaning of RICO is a "debt (A) … unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with … the business of lending money … at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(a)(6) (stating the foregoing usury definition); *Peters Fabrics, Inc. v. Textiles Fabricato de Nicaragua, S.A.*, 1985 U.S. Dist. LEXIS 20737, at *11 (S.D.N.Y. Apr. 15, 1985) ("In order to adequately allege a claim for collection of an unlawful debt within the meaning of RICO, [a plaintiff] would have to show that ... the debt was unenforceable in whole or in part because of state or federal laws relating to usury[,] the debt was incurred in connection with 'the business of

40

lending money ... at a [usurious] rate,' and ... the usurious rate was at least twice the enforceable rate.") (citations and internal quotations omitted).  Here, the merchant agreements charge interest exceeding 50% per annum, and engaging in those practices and collecting upon merchant agreements is the counterclaim defendants' business.

An enterprise within the meaning of RICO is easy to show—because, in § 1961(4)'s broad, non-exclusive words, "'enterprise' includes any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." *United States v. Lee*, 2016 U.S. App. LEXIS 15542, at *9–10 (2d Cir. Aug. 24, 2016) ("Congress deliberately defined the term ['enterprise'] as broadly as possible.") (citation and internal quotations omitted).  TVT Capital thus is an enterprise because it is a limited liability company.

Not only is TVT Capital an enterprise, the counterclaims aver TVT Capital is part of a separate, stand-alone enterprise, denominated the "Larger TVT Enterprise" (¶ 135), consisting of at least (i) TVT Capital; (ii) non-law firm debt collection firms, such as Colonial Funding Network, Inc.; and (iii) related debt collectors, and other companies that too make merchant agreements.  TVT Capital (or another person) makes a merchant agreement and both that "Funder," and a non-law firm debt collection firm, and others, work together to collect upon them.  Counterclaims ¶ 135.  Members of the Larger TVT Enterprise in some cases share personnel, office space, and other resources.  Counterclaims ¶ 136.[12]

---

[12] For example, documents from the Westchester County action indicate TVT Capital or its personnel are affiliated with Cap Call, LLC, a different merchant agreement company, because Andrew Fellus while reportedly acting for TVT Capital had asked Shaun Passley to send loan materials not to TVT Capital, but to Cap Call, LLC.  Cap Call, LLC, papers in the Westchester County action show, is affiliated with a non-law firm debt collector, RTR Recovery LLC, whose address is the same as Cap Call, LLC.  Those non-law firm entities sometimes purport to be a law practice entering judgments by confession.  The dismissal memorandum (p. 19) calling the Larger TVT Enterprise amorphous thus is inaccurate.  In any event, an amorphous entity is perfectly proper to aver under RICO because a RICO enterprise, by its nature, may not have the attributes of a legitimate business.  *United States v. Krasniqi*, 555 Fed.

This action thus involves at least two enterprises: TVT Capital and the Larger TVT Enterprise. An enterprise that commits wrongful acts firsthand often presents an identifiable lawsuit target. But Congress by enacting RICO recognized that a wrongdoer enterprise often consists of constituent persons or entities who are just as much culpable as the enterprise because those persons direct the wrongdoer—and often keep crime proceeds. Pre-RICO, although the upfront enterprise could be targeted, sometimes persons who directed an enterprise's wrongdoing, and benefitted from it, escaped liability. RICO extended the law's reach to those persons; and the statute is construed broadly to effect its remedial purpose. *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 17 (2010) ("This Court has interpreted RICO broadly ....").

*B. RICO's Four Bases for Liability*

RICO, at § 1961, contains only definitions, including those discussed above. The substantive bases for RICO liability are stated in the statute's next section, § 1962, which contains the following four, independent liability basis:

1. investing income derived from a pattern of racketeering activity or collection of an unlawful debt (18 U.S.C. § 1962(a));

2. acquiring control of an enterprise through a pattern of racketeering activity or collection of an unlawful debt (18 U.S.C. § 1962(b));

3. conducting the affairs of an enterprise through a pattern of racketeering activity or collection of an unlawful debt (18 U.S.C. § 1962(c)); and

4. conspiracy to do acts proscribed above (18 U.S.C. § 1962(d)).

The third RICO liability basis (§ 1962(c)) contains broad terms; and thus is widely invoked and occupies much RICO case law. Because § 1962(c), in its words, targets those "*conducting* the

---

Appx. 14, 17 (2d Cir. 2014) ("It is beyond peradventure that a RICO enterprise is not required to have business-like attributes such as a name, a hierarchical structure, a set membership, or established rules.") (citations omitted).

affairs of an enterprise," not the enterprise itself, common law refers to what it has denominated the "person / enterprise distinction"—meaning an enterprise may not properly be a § 1962(c) defendant because that section targets only those conducting an enterprise's affairs.

The Larger TVT Enterprise thus generally may not properly be a § 1962(c) defendant.  But its constituent parts, such as Colonial Funding, TVT Capital, and their personnel (*e.g.* Andrew and Warren Fellus), each *is* a proper § 1962(c) defendant.  The natural person counterclaim defendants additionally face § 1962(c) liability not only because of conducting the Larger TVT Enterprise's affairs, but also because TVT Capital is a separate enterprise whose affairs they conduct too.

So the movants assert, the person / enterprise distinction applies not only to § 1962(c) claims, but also to § 1962(a) and (b) claims.  Dismissal memo p. 18 (final para.) ("*Each § 1962 subpart* requires the existence of [an] 'enterprise,' which is separate and distinct from the RICO 'person.'") (emphasis added).  The movants are wrong.  Under §§ 1962(a) and (b), an enterprise (not just the persons operating it) may properly face liability.  Even the dismissal memorandum's *Wild Edibles* citation (p. 18, final para.) so states.[13]  With the above principles in mind, Epazz and Shaun Passley have properly averred RICO claims for the following reasons.[14]

---

[13] *Wild Edibles*, 2008 WL 4548392 at *1 ("To establish liability under Section 1962_(c)_ requires the existence of two distinct entities: (1) a person and (2) an enterprise that is not simply the same person referred to by a different name.") (emphasis added).

[14] The dismissal memorandum citation (p. 19) to *Cruz v. FXDirectDealer LLC*, 720 F.3d 115, 121 (2d Cir. 2013) is off the mark because in that Section (c) action the alleged enterprise in pertinent part consisted of an entity (a company), and the plaintiff there tried to use that company's personnel to aver an enterprise separate from the company.  *Id.* at 121 ("The [Section (c)] requirement of distinctness cannot be evaded by alleging that a corporation has violated the statute by conducting an enterprise that consists of itself plus all or some of its officers or employees.").  Here, in vivid contrast, TVT Capital is not a Section (c) defendant because it is associated with its personnel, but is a Section (c) defendant because of its association with the separate, Larger TVT Enterprise, consisting of at least TVT Capital and separate entities such as (i) a non-law firm debt collection firm, including Colonial Funding, and (ii) related debt collectors, and other companies that too make merchant agreements, such as Cap Call, LLC.

### C.  The § 1962(a) Claim

18 U.S.C. § 1962(a) provides:

It shall be unlawful for any person who has received any income derived, directly or indirectly, from a pattern of racketeering activity or through collection of an unlawful debt in which such person has participated as a principal within the meaning of section 2, title 18, United States Code,[15] *to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in acquisition of any interest in, or the establishment or operation of, any enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce.

(Emphasis added.)

TVT Capital's business is all about using or investing merchant agreement income in establishing, operating, and owning (in part) the Larger TVT Enterprise because, without that continued investment, the counterclaim defendants could not fund, and then try to enforce, additional merchant agreements.  The investment into the enterprise thus caused harm to Epazz and Shaun Passley because that continued investment is what permits the counterclaim defendants to do ongoing business.  *Cook v. Easy Money of Kentucky, Inc.*, 196 F. Supp. 2d 508, 514 (W.D. Ky. 2001) (upholding § 1962(a) claim against an enterprise that invested fraudulently obtained funds in itself in order to continue and grow its fraudulent check-cashing business); *Colonial Penn Ins. Co. v. Value Rent-A-Car, Inc.*, 814 F. Supp. 1084, 1095 (S.D. Fla. 1992) (reinvestment of fraud proceeds to perpetuate operation of an enterprise stated a Section 1962(a) claim); *Official Publications v. Kable News Co.*, 775 F. Supp. 631, 634 (S.D.N.Y. 1991) ("invest[ing] racketeering income in the criminal enterprise that injured [the plaintiff]" stated a Section 1962(a) claim). Additionally, TVT Capital's investment, and continued re-investment, in itself to continue to be able to make merchant agreements independently supports § 1962(a) liability.

---

[15] Principal under 18 U.S.C. § 2 includes, in that statute's words, a person who "commits" an offense or "aids, abets, counsels, commands, induces or procures its commission"—and thus covers each of the counterclaim defendants.

Because the natural person counterclaim defendants cause TVT Capital to engage in the proscribed conduct, they aid, abet, counsel, command, induce, and procure its commission. Colonial Funding aids and abets TVT Capital by (among other things) merchant agreement servicing. Investment, and continued re-investment, into the enterprise is what makes the merchant agreement business function.

### D. The § 1962(b) Claim

18 U.S.C. § 1962(b) provides:

It shall be unlawful for any person through a pattern of racketeering activity or through collection of an unlawful debt *to acquire or maintain, directly or indirectly, any interest in or control of any enterprise* which is engaged in, or the activities of which affect, interstate or foreign commerce.

(Emphasis added.)

TVT Capital, for reasons discussed above, has acquired and maintained an interest in and control of, the Larger TVT Enterprise through the collection of an unlawful debt or pattern of racketeering activity, without which TVT Capital could not make merchant agreements, including those entered into with Epazz and Shaun Passley. *Black Radio Network, Inc. v. NYNEX Corp.*, 44 F. Supp. 2d 565, 579 (S.D.N.Y. 1999) ("To state a claim for a violation of § 1962(b), plaintiffs must allege that the object of defendants' racketeering activity was to gain an interest in or maintain control of the enterprise ... [and] Section 1962(b) further requires that plaintiffs allege injury from defendants' acquisition or control of the enterprise -- an 'acquisition injury' -- that is distinct from injury based on the alleged predicate acts.") (citations omitted).

The natural person counterclaim defendants have acquired and maintain an interest in and on a day-to-day basis control, TVT Capital and the Larger TVT Enterprise, without which TVT Capital could not make merchant agreements. Colonial Funding too has acquired and maintained

45

an interest in and on a day-to-day basis controls, the Larger TVT Enterprise.  Indeed, searching

New York State electronically filed Supreme Court cases shows Colonial Funding is a purported

merchant agreement plaintiff in dozens of cases.[16]  It is only through the concerted efforts of the

Larger TVT Enterprise that the counterclaim defendants are able to perpetuate their merchant

agreement business and make such agreements with Epazz and other companies.

### E.  The § 1962(c) Claim

18 U.S.C. § 1962(c) provides:

It shall be unlawful for any person employed by or associated with
any enterprise engaged in, or the activities of which affect, interstate
or foreign commerce, *to conduct or participate, directly or
indirectly, in the conduct of such enterprise's affairs through a
pattern of racketeering activity or collection of unlawful debt*.

(Emphasis added.)

A § 1962(c) claim is easily pleaded in this action because the counterclaim defendants each

conduct and participate in the affairs of TVT Capital and/or the Larger TVT Enterprise through

usury or, alternatively, mail and wire fraud.  The counterclaim plaintiffs were injured by the above

conduct because they have entered into, and paid money to TVT Capital pursuant to, merchant

agreements, and have been the subject of collection efforts.

### F.  The § 1962(d) Claim

18 U.S.C. § 1962(d) provides:

It shall be unlawful for any person to conspire to violate any of the
provisions of subsection (a), (b), or (c) of this section.

(Emphasis added.)

So the dismissal memorandum asserts (p. 22), the RICO conspiracy counterclaim "fails

both because it consists of nothing but the barest legal conclusions … and because the underlying

---

[16] https://iapps.courts.state.ny.us/nyscef/CaseSearch?TAB=name

§§ 1962(a), (b) and (c) counterclaims fail."  The movants' assertions are inaccurate.  *First*, the counterclaims aver in detail facts supporting usury or, alternatively, fraudulently representing a loan subject to usury proscriptions would be made.  Each of the counterclaim's detailed averments are incorporated by reference into the RICO conspiracy claim (sixth counterclaim) because that counterclaim (as do the others) state it is "incorporating all previous allegations"—and that contradicts the dismissal memorandum's "consists of nothing but the barest legal conclusions" assertion.  *Second*, conspiracy is *not* duplicative of §§ 1962(a)–(c) because, in the event an (a), (b), or (c) claim is not shown, conspiracy liability still exists because it is averred that the counterclaim defendants subjectively intended, and agreed, to commit usury or fraud and engaged in acts toward furthering that agreement resulting in the merchant agreements.  Conspiracy results in § 1962(d) liability even if the counterclaim defendants failed in their attempt to commit §§ (a)–(c) violations.  *Aller v. United States*, 646 Fed. Appx. 21, 24 (2d Cir. 2016) ("[A] conspiracy may exist and be punished whether or not the substantive crime ensues.").  Moreover, Congress intended RICO conspiracy to be broad, by eliminating an overt acts criterion and otherwise making conspiracy a stand-alone, less onerous claim to establish.  *Id.* ("Neither overt acts, nor specific predicate acts that the defendant agreed personally to commit, need be alleged or proven for a section 1962(d) offense.") (citations and internal quotations omitted); *City of New York v. Bello*, 579 Fed. Appx. 15, 17 (2d Cir. 2014) ("[R]equirements for [a RICO] conspiracy ... are less demanding than those for substantive violations ... [and] a party may be liable for [RICO] conspiracy even though he was incapable of committing the substantive offense.") (citations and internal quotations omitted) (last alteration in original); *United States v. Yannotti*, 541 F.3d 112, 129 (2d Cir. 2008) ("[T]he RICO conspiracy statute, § 1962(d), broadened conspiracy coverage by omitting the requirement of an overt act.") (citation and internal quotations omitted).

IX.      **Rescission was Properly Pleaded**

Largely skipped over by the dismissal motion are averments that, even assuming a merchant agreement is a sale of future accounts receivable, the counterclaim plaintiffs still should prevail based on lack of mutual asset, unilateral mistake, or fraud.  Elements of a rescission claim are (i) misrepresentation, concealment or nondisclosure of a material fact; (ii) an intent to deceive; and (iii) injury resulting from justifiable reliance by the aggrieved party.  *Allen v. WestPoint-Pepperell, Inc.*, 945 F.2d 40, 44 (2d Cir. 1991) (stating the foregoing elements) (citations omitted). *Mills v. Everest Reinsurance Co.*, 410 F. Supp. 2d 243, 253 (S.D.N.Y. 2006) ("A claim for rescission is governed by a six-year statute of limitations ....") (citations omitted).

In the event the Court concludes the merchant agreements are not usurious loans, the counterclaims aver misrepresentation because of the Loan Application and written and verbal loan representations.  Counterclaims ¶¶ 119–29.  TVT Capital intended to deceive Epazz and Shaun Passley because, through the loan representations, they caused those persons to enter into agreements they otherwise would not have because Epazz sought only loans under which gains are capped by usury proscriptions.  Counterclaims ¶¶ 114–16.  Epazz and Shaun Passley were injured because of purportedly being liable for hundreds of thousands of dollars under the merchant agreements.

The merger clause upon which the movants rely is one-sentence long, stating, in its entirety, "This Agreement and Security Agreement herein embody the entire agreement between Merchant and FUNDER and supersede all prior agreements and understandings related to the subject matter hereof."  Passley Dec. Ex. B p. 3 § 4.8 (final sentence).  The merger clause thus is a very general one—and under New York law that means it is nugatory because of the counterclaims' fraud averments.  *Fierro v. Gallucci*, 2008 U.S. Dist. LEXIS 38513, at *38-41 (E.D.N.Y. May 12,

2008) ("It is well-settled that a *general* merger clause is generally insufficient to exclude parol evidence to show fraud in the inducement ... [because] the parol evidence rule [applies only] where the merger clause contains an explicit disclaimer regarding the same subject matter as the alleged oral representation", and distinguishing *Danann Realty*, upon which Colonial Funding and TVT Capital rely, as an "instance[] where ... oral representations ... directly contradict[ed] a specific provision in the agreement"); *Century Pacific, Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 228–29 (S.D.N.Y. 2007) ("[U]nder New York law, a general merger clause precludes neither an action for fraud in the inducement nor parol evidence concerning fraudulent representations.") (citations and internal quotations omitted); *Hershey Foods Corp. v. Collegiate Mktg.*, 1996 U.S. Dist. LEXIS 17698, at *5 (S.D.N.Y. Nov. 25, 1996) ("A merger clause does not preclude an action for fraud in the inducement, nor does it preclude parol evidence concerning fraudulent representations.") (citation omitted).  The dismissal memorandum (p. 3, fourth line) even describes the merger clause as being a "standard" one; and thus is general only and does not bar the counterclaims' fraud averments.

If TVT Capital openly discussed contract terms, few persons likely would sign a merchant agreement—and Epazz and Shaun Passley did not assent to do so because they sought loans and completed a Loan Application based upon loan representations.  *McNamara v. Tourneau, Inc.*, 464 F. Supp. 2d 232, 238 (S.D.N.Y. 2006) ("Even if parties intend to be bound, it necessarily follows that the contract is unenforceable if there is no meeting of the minds -- the parties have a different understanding of the material terms of their agreement.") (citations omitted); *Trustees of the ALA-Lithographic Pension Plan v. Crestwood Printing Corp.*, 127 F. Supp. 2d 475, 480 (S.D.N.Y. 2001) ("To be sure, parties must abide by the basic duty to read a contract before signing[,] [h]owever, whether defendant in this case had the reasonable opportunity to know the character

and essential terms of the contract before signing appears to be a question of fact that must be determined at trial ... [and] this issue does not preclude defendant from presenting evidence in support of its defense of fraud in the execution.") (citation omitted).  The contract could have called itself, "Agreement to Operate a Business to Generate Receivables for TVT Capital," or anything else describing its true nature, but it does not.  The counterclaim defendants could have asked Epazz to sell its future receivables, but they did not and, instead, represented that only loans would be made.  The agreements could make bank statement requirements conspicuous, or otherwise draw attention to that requirement, but the counterclaim defendants' goal is forfeiture of an ink on paper account reconciliation right to lock-in approximately 49% gains in about two to six months.  Because of the foregoing, and every other fact discussed above, rescission has been properly pleaded.

Alternatively, unilateral mistake is an independent basis to rescind the merchant agreements.  *Leasco Corp. v. Taussig*, 473 F.2d 777, 783 (2d Cir. 1972) ("When a person has induced another to act by representations which are false in fact, although not dishonestly made, and damage has resulted directly from the action taken, the person making such representations often bears the loss.") (citations omitted); *Ritchie v. Gano*, 2008 U.S. Dist. LEXIS 67770, at *34–35 (S.D.N.Y. Sept. 8, 2008) (courts allow rescission based on unilateral mistake where a party establishes that it entered into a contract under a mistake of material fact or where the mistake concerns a basic assumption on which the contract was made) (citations omitted); *Yurman Design, Inc. v. Garden Jewelry Mfg. Corp.*, 2003 U.S. Dist. LEXIS 15051, at *8 (S.D.N.Y. Aug. 29, 2003) ("A unilateral mistake occurs where the defect in the written agreement is the product of the unilateral mistake of one party and the fraud of the other.") (citation and internal quotations

omitted).  Here, in light of the Loan Application, written loan representations, and other loan representations, unilateral mistake is also a basis to rescind the merchant agreements.

Even if fraud were absent, still unilateral mistake is proper rescission grounds.  *Kraft Foods, Inc. v. All These Brand Names, Inc.*, 213 F. Supp. 2d 326, 330 (S.D.N.Y. 2002) ("If the party establishes a unilateral mistake as to a basic assumption of the contract, a court may void [the contract] *even in the absence of fraud*.") (emphasis added) (citations and internal quotations omitted).  Because fraud need not even have been averred to support unilateral mistake -- and especially because fraud *was* involved -- unilateral mistake should effect rescission of the merchant agreements insofar as they otherwise are enforceable contracts.

## X.    Fraudulent Inducement Voids the Agreements

Under New York law, the elements of fraud in the inducement are: representation of a material existing fact, falsity, scienter, deception, and injury.  *Holloway v. King,* 361 F. Supp. 2d 351, 359 (S.D.N.Y. 2005) (stating the foregoing elements) (citations and internal quotations omitted).  For reasons discussed above, the counterclaims have properly averred fraudulent inducement.

## XI.   Unconscionability Applies Even if the Agreements are Not Loans and Not Rescinded

Alternatively, if under a merchant agreement Epazz sold its future accounts receivable, and that agreement is not fraudulent or rescinded, unconscionability should bar a merchant agreement's enforcement because a 98%–294% per annum gain invokes public policy underlying usury even if a contract is not a usurious loan.  *Sandra's Jewel Box Inc. v. 401 Hotel, L.P.*, 273 A.D.2d 1, 3, 708 N.Y.S.2d 113 (1st Dep't 2000) (365% per annum penalty in a lease "should not be enforced … [because, although] ***not technically interest***, [it] is unreasonable and confiscatory in nature and therefore unenforceable when examined in the light of the public policy expressed in Penal Law §

51

190.40, which makes an interest charge of more than 25% per annum a criminal offense") (citation omitted) (emphasis added). Under *Sandra's Jewel Box*, unconscionability applies because the gain TVT Capital undeniably wishes to acquire invokes public policy underlying usury even if there is not technically interest.

### XII.    Prima Facie Tort Was Properly Pleaded

So the dismissal memorandum asserts (p. 24), prima facie tort "should not be pleaded when there is another cause of action that covers the same allegations." The movants are wrong. The principle they cite was, more than forty years ago, New York law; but New York's highest court overruled it 1975. *Board of Ed. of Farmingdale Union Free Sch. Dist. v. Farmingdale Classroom Teachers Ass'n, Inc.*, 38 N.Y.2d 397, 406, 343 N.E.2d 278, 285, 380 N.Y.S.2d 635, 645 (1975) (overruling prior law to hold that prima facie tort now may be pleaded together with traditional tort claims). This Court, of course, has followed *Farmingdale*. *Western Meat Co. v. IBP, Inc.*, 683 F. Supp. 415, 416 (S.D.N.Y. 1988) ("[I]t [is] permissible under New York law to plead [a] traditional tort and prima facie tort in the alternative, even where, as here, the claims rest upon a single set of allegations.") (citation omitted); *Belsky v. Lowenthal*, 62 A.D.2d 319, 322, 405 N.Y.S.2d 62, 64–65 (1st Dep't 1978) ("It was the law at one time that a cause of action in prima facie tort could not exist when all the damages sustained were attributable to a specific recognized tort; however, in in *Board of Education v. Farmingdale* … the court held that [such] rule will not be blindly applied to prohibit alternative pleading in the area of prima facie tort [because] there may be instances when the traditional tort cause of action will fail and plaintiff should be allowed to assert this alternative claim.") (citations and internal quotations omitted).

The movant's intent, the counterclaims aver, is to knowingly acquire gains of approximately 49% over two to six months (equating to 98%–294% annually). Assuming for

purposes of the dismissal motion that the transactions are not usurious, that situation is what *prima facie* tort targets because that tort applies to conduct that *is* otherwise legal but nonetheless should be considered a tort. *Belsky*, 62 A.D.2d at 322, 405 N.Y.S.2d at 64 (prima facie tort, by definition, applies to "an act or series of acts which would otherwise be lawful") (citation and internal quotations omitted). Intentionally trying to circumvent what penal law makes felonious should qualify as disinterested malevolence sufficient to support a *prima facie* tort claim.

### XIII.   <u>Good Faith and Fair Dealing Applies</u>

Finally, if a merchant agreement is a sale of future accounts receivable, immune to fraud, rescission, unconscionability, and prima facie tort, because the counterclaims aver that TVT Capital in practice regularly does not honor account reconciliation requests, and seeks to trigger forfeiture of account reconciliation and other things to lock-in a fixed payment obligation, those things violate the covenant of good faith and fair dealing. *Barbara v. MarineMax, Inc.*, 577 Fed. Appx. 49, 50 (2d Cir. 2014) ("Under New York law, the implied covenant of good faith and fair dealing provides that neither party to a contract shall do anything which has the effect of destroying or injuring the right of the other party to receive the fruits of the contract ... [and] [i]n determining whether a party has breached the covenant of good faith and fair dealing, a court must examine not only the express language of the parties' contract, but also any course of performance or course of dealing that may exist between the parties.") (citations and internal quotations omitted).

TVT Capital may not properly include an account reconciliation forfeiture that, when triggered, guarantees to TVT Capital an approximately 49% gain in about two to six months without even once bringing to a merchant's attention the significance of that provision because, under those circumstances, the covenant of good faith and fair dealing imposes an affirmative obligation upon TVT Capital to advise a merchant of the requirement to provide "any and all"

bank statements and the severe consequences of failing to do so just once.  *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 98 (2d Cir. 2007) ("In some cases, the covenant [of good faith and fair dealing] may even require affirmative steps to cooperate in achieving the contract's objective.") (citation and internal quotations omitted).

### XIV.   **Defenses Were Properly Pleaded**

Fourteen defenses are asserted in the answer—the dismissal motion targets ten (the first, second, and seventh through fourteenth defenses).  Each defense is addressed in turn.

#### A.  *Usury (First Defense)*

Although Epazz and Shaun Passley may aver a usury claim because they asserted counterclaims within the one-year limitations period, usury is also a defense, and should be upheld for reasons discussed above.

#### B.  *Colonial Funding Lacks Standing (Second Defense)*

So the dismissal memorandum asserts (p. 24), "The Second Defense ('standing') should be dismissed because its stated basis – that Colonial 'is not a party to the agreements allegedly breached' … – contradicts Defendants' agreement that Colonial is the authorized servicing agent for TVT."  But a servicing agent within the meaning of a merchant agreement is a limited duty, because it consists merely of, in a merchant agreement's words, "providing administrative, bookkeeping, reporting and support services for Warren Fellus TVT Capital and the Merchant."  Passley Dec. Ex. B p. 5 (bottommost para.).  The merchant agreement adds, "Colonial is not affiliated or owned by the Warren Fellus TVT Capital and is acting as independent agent for services including but not limited to background checks, credit checks, general underwriting review, filing UCC-1 security interests, cash management, account reporting and credit capture."

Being a plaintiff in litigation is ***not*** on the list—and that is an independent reason Colonial Funding lacks standard.

Even if a merchant agreement did purport to authorize Colonial Funding to be a plaintiff even though the allegedly aggrieved party is TVT Capital, FED. R. CIV. P. 17(a), set forth below, would prohibit that:

> (1) … An action must be prosecuted in the name of the real party in interest.
>
>       \*  \*  \*
>
> (3) Joinder of the Real Party in Interest.  The court may not dismiss an action for failure to prosecute in the name of the real party in interest until, after an objection, a reasonable time has been allowed for the real party in interest to ratify, join, or be substituted into the action.   After ratification, joinder, or substitution, the action proceeds as if it had been originally commenced by the real party in interest.

Because the above rule requires an action to be brought in the name of the real party in interest, TVT Capital is the only proper plaintiff.   FED. R. CIV. P. 17(a)(1) even enumerates exceptions to that rule, *e.g.*, for an executor or administrator, but a merchant agreement servicer is not on that list.

A service provider, such as Colonial Funding, of course, gives services to an entity, but does not step into that entity's legal rights merely because it provides contracted-for services.  The movants do not assert a merchant agreement grants to Colonial Funding the right to sue on TVT Capital's behalf and, even if a merchant agreement did provide that, which it does not, TVT Capital still would be the only proper plaintiff within the meaning of FED. R. CIV. P. 17.  *Cortlandt St. Recovery Corp. v. Hellas Telecomms.*, 790 F.3d 411, 418 (2d Cir. 2015) ("[A] provision by which one person grants another the power to sue on and collect on a claim confers on the grantee a power of attorney with respect to that claim ... [but] [t]he grant of a power of attorney ... is *not the*

*equivalent of an assignment of ownership; and, standing alone, a power of attorney does not enable the grantee to bring suit in his own name* ... [and, likewise,] [a]n assignment ... which does not transfer ownership of claims, is, on its own, insufficient to permit [an assignee] to sue on those claims in its name.") (citations and internal quotations omitted) (emphasis added).  The second defense is meritorious because TVT Capital is the real party in interest, and dismissal of the underlying complaint would be appropriate insofar as Colonial Funding continues to purport to be the plaintiff.

### C.  Duty to Mitigate (Seventh Defense)

Duty to mitigate under New York contract law is a universal obligation, imposing upon a non-breaching contract party a duty to minimize loss caused by another's contract breach.  So the dismissal memorandum (p. 25) asserts, however, the answer's failure to mitigate defense, including without limitation TVT Capital's failure to collect the receivables it purportedly purchased absolutely, "should be dismissed because it is contrary to the express terms of the Agreement, under which the obligation to collect rests solely on Defendants."  New York's duty to mitigate, however, applies precisely where a counterparty *has* breached an obligation.  The breach triggers the duty—and that duty targets the very thing the breaching party should have done.  *Tractebel Energy Mktg. v. AEP Power Mktg.*, 487 F.3d 89, 110 n.21 (2d Cir. 2007) ("The non-breaching party is, of course, under a duty to mitigate damages to the extent practicable ....") (citation omitted); *Versatile Housewares & Gardening Sys. Inc. v. Thill Logistics, Inc.*, 819 F. Supp. 2d 230, 247 (S.D.N.Y. 2011) ("New York law requires the plaintiff in a breach of contract action to mitigate damages it incurs; failure to do so will result in the defendant not being charged with them."); *U.S. Bank Nat'l Ass'n v. Ables & Hall Builders*, 696 F. Supp. 2d 428, 441 (S.D.N.Y. 2010) ("The duty to mitigate damages comes into play once there has been a *breach* of a contract.")

(citation omitted) (emphasis in original).  In the event this Court concludes Epazz sold its future

accounts receivable to TVT Capital pursuant to the merchant agreements and that such agreements

are immune to claims or other defenses, damages must be reduced insofar as the plaintiff failed to

collect the receivables it purportedly owns in order to mitigate damages.

### D.  Attorneys' Fees are Improperly Claimed (Eighth Defense)

Because  the  merchant  agreements  should  be  held  unenforceable  for  each  of  the

independent reasons discussed above, those agreements' contractual attorneys' fees provisions

should fall with the rest of the contracts.

Alternatively, if a merchant agreement is enforceable, attorneys' fees still should not be

awarded because, the answer asserts, at its sixth defense, TVT Capital breached the merchant

agreements by not disbursing to Epazz the full or proper amount of the alleged "Purchase Price"

stated in each of the agreements.  Because TVT Capital committed the foregoing threshold breach

of contract, it excused Epazz from performance.  The dismissal motion does not target the sixth

defense, and thus leaves alone the averment that TVT Capital failed to perform—and that breach

makes Colonial Funding ineligible to collect attorneys' fees or other contractual sums from the

defendants.

### E.  Fraud, Rescission, and Unconscionability (Ninth Through Twelfth Defenses)

Although  Epazz  and  Shaun  Passley  have  timely  asserted  fraud,  rescission,  and

unconscionability claims, those points may also be asserted as defenses and should be upheld for

reasons discussed above.

### F.  Licensed Lender Law (Thirteenth Defense)

TVT Capital regularly enters into merchant agreements with businesses in the principal

amount of $50,000 or less.  Should the Court conclude (as it should) that a merchant agreement is

a loan, TVT Capital has run afoul of New York's Licensed Lender Law (N.Y. Banking Law § 340 *et seq.*) because that law prohibits charging, taking, or receiving interest on such loans exceeding 16% without first obtaining a license issued by New York's Department of Financial Services. TVT Capital, the thirteenth defense avers, has no such license, and thus does business unlawfully. *See Watkins v. Guardian Loan Co. of Massapequa, Inc. (In re Watkins)*, 240 B.R. 668, 672 (Bankr. E.D.N.Y. 1999) ("[Under] the Licensed Lender Law, [a lender holding a license pursuant to that law] is not subject to the statutory limits on the rates of interest that may be charged pursuant to Section 5-501 of the New York General Obligations Law [*i.e.*, New York's 16% civil usury statute] ... and Section 190.40 of the New York Penal Law ... [h]owever, the Licensed Lender Law does subject licensed lenders to stringent restrictions, such as limiting the type of security they can take and prohibiting them from charging examination fees, service fees, brokerage commissions or any other expenses, fees or bonuses not specifically authorized by the statute ....").

### G. Estoppel (Fourteenth Defenses)

Finally, even if the merchant agreements are Epazz selling its future accounts receivable, are immune to rescission, fraud, unconscionability, prima facie tort, and other claims and defenses, Colonial Funding's action still should be defeated because the Loan Application and loan-only written and verbal representations should estop the plaintiff from now asserting that a merchant agreement is an accounts receivable purchase or anything else other than a loan. *Harbinger Capital Partners LLC v. Deere & Co.*, 632 Fed. Appx. 653, 658 (2d Cir. 2015) ("Equitable estoppel precludes a party at law and in equity from denying or asserting the contrary of any material fact which he has induced another to believe and to act on in a particular manner.") (citation and internal quotations omitted).  Estoppel also should not be decided upon a dismissal motion because it presents questions of fact.  *Kosakow v. New Rochelle Radiology Assocs.,*

*P.C.*, 274 F.3d 706, 725 (2d Cir. 2001) ("Whether equitable estoppel applies in a given case is ultimately a question of fact.") (citation omitted).

## **CONCLUSION**

For the above reasons, the Court should deny Colonial Funding and TVT Capital's dismissal motion entirely, and grant any other relief the Court deems appropriate.

Dated: New York, New York
         October 31, 2016

Respectfully submitted,

**JONATHAN M. PROMAN, ESQ.**

By:  *Jonathan M. Proman*
         Jonathan M. Proman

30 Wall Street, Eighth Floor
New York, New York 10005
(917) 524-7566
jproman@promanlaw.com

*Attorney for Defendants/Counterclaim Plaintiffs*
*Epazz, Inc., Cynergy Corporation, and*
*Shaun Passley (a/k/a Shaun A. Passley)*